DEAN, executor, *vs.* THE CENTRAL COTTON PRESS COMPANY.

1. A will provided first for the payment of the debts of the testator, then for the payment of certain specific bequests, then that the balance of his estate should go to his son for life, with remainder to the children of such son, if any, and if none, then to certain other relatives. It also provided that the son should not be allowed to control the property until he should become of age; and that the executors should see to his religious and secular education. The son became of age in 1854, and died in 1860, leaving a child born in 1855. On an *ex parte* proceeding in equity in 1843, filed less than thirty days before the term, the court of chancery of the county where the executor lived, and in which he obtained letters of administration, rendered a decree, founded on the verdict of a jury, allowing him to sell certain realty in order to pay a debt and to make the distribution required by the will, and the sale took place accordingly:

*Held*, that though the proceeding was irregular, the court was not without jurisdiction to render the decree, and not being void, it cannot be collaterally attacked. The executory devisee was not then born, and the executor represented her interest so far as it could have a representative.

2. Prescriptive title which is good as against the executor of an estate, is also good as against the executory devisee born thereafter, and whose interest was represented by such executor.

Estates. Equity. Jurisdiction. Administrators and executors. Devise. Legacies. Title. Prescription. Before Judge FLEMING. Chatham Superior Court. December Term, 1879.

Reported in the decision.

JAMES ATKINS; JNO. G. CLARKE, for plaintiff in error.

GEORGE A. MERCER, for defendant.

JACKSON, Justice.

Dean, as executor of the will of Louise O'Byrne, brought suit to recover a city lot in Savannah against The Central Cotton Press Company. The title of Miss O'Byrne, the plaintiff's testatrix, rested on the will of her grandfather, Lawrence O'Byrne. He died in 1836, and another executor having ceased to act, Porter took charge of the estate left by the will in 1838. In 1843 he applied by bill in equity to the superior court to sell a part of the real estate in order to pay a debt and certain monied legacies, and by a decree in chancery, he was directed so to sell, and did sell; and the defendant holds under that sale, so that plaintiff and defendant both claim through Lawrence O'Byrne, and hold their titles under his will, which is as follows:

"1st Item.—In the first place I charge my estate with the payment of all my just debts.

"2d Item.—I give unto my immediate relatives the sum of five thousand dollars, to be equally divided among them, that is to say, unto my father, John O'Byrne, my brothers, Moses, Michael, John and James, and my sister Mary, of the Township Chapel, county of Wexford, Ireland, and in case of, the death of either of the above named persons, the amount or proportion of the above named five thousand dollars, which has been bequeathed him or her shall be equally divided among the survivors. I charge my executors to pay over the above named legacy within two years from the date of my death. The lease of the store next to the City Hotel, in the city of Savannah, now in my possession, and leased by me from the estate of Guerard, shall be transferred to Michael Oliver Dillon for the balance of the unexpired term of said lease, he paying rent for the same on the terms which I have rented it for.

"3d Item.—I give and bequeath unto the vestrymen or trustees of the Roman Catholic Church, of Savannah, the sum of four hundred dollars, the same to be applied to the building of the new Catholic Church, or towards extinguishing its debts, if any there be.

"4th Item.—I give and bequeath unto the Reverend Jeremiah F. O'Neil the sum of two hundred dollars.

"5th Item.—I give and bequeath unto my son James Jeremiah (after paying the above named legacies), the whole of my real and personal estate, consisting of houses, lands, tenements, negroes, etc., as will appear by deeds and titles in my possession, to have and to hold the same for his use as specified in the following, viz: to receive all the proceeds of the rents, interest, etc., which may accrue from the property for his own and special use, after deducting the necessary expenses on the same property—but in no case whatsoever shall he be allowed, until he shall have arrived at the age of twenty one years, the control or management of the said property or estate, but allowed such sums as my executors may deem necessary for his education and maintenance. I further command that my son, James Jeremiah, shall not have the power of disposing or selling the above property during his natural life, his possession or benefit of the same being but for his natural life, but in case of any lawful issue by him, then the same shall descend to his child or children for their use and benefit, and to be used or disposed of as they may think proper or fit. But in the event of no lawful issue from him, the above named property shall be equally divided among my relatives named in this will.

"6th Item.—I request of my executors to pay particular attention to the education of my son, James Jeremiah, to see that he is properly instructed in the faith of the Roman Catholic Church, and to receive a finished education in some Catholic college in the United States.

"7th Item.—*And lastly,* I do ordain and appoint Anthony Porter and Michael Oliver Dillon my executors to this my last will and testament.

\*    \*    \*    \*    \*    \*    \*    \*    \*

L. O'BYRNE."

"Dated January 16, 1836."

It will be observed that by the first item of the will, the entire estate is charged with the payment of the testator's debts; that by the second item, a legacy of five thousand dollars is left to certain relatives in Ireland, to be paid them within two years from his death; and that by the 5th item, *after payment of the legacies,* the whole estate is given to James Jeremiah, his son, for life, with directions that he is not to control the property until twenty-one, even as life tenant, and in the event of issue by him, "then the same shall descend to his child or children for their use and benefit, and to be used or disposed of as they may think proper or fit," and in the event that he leaves no child, then the property to go to the Irish relations named in the second

item. By the sixth item the executors are entrusted with the education of James Jeremiah, with his instruction in the faith of the Roman Catholic Church, and his secular education is to be a *finished* education, and in some Catholic college in the United States.

James Jeremiah became of age in 1854, and died in 1860, leaving one child, born in December, 1855, and died in July, 1876, still in her minority; she left a will, with plaintiff as executor, and he sues for this property as her land at the date of her death.

The defendant defends on two grounds: First, regular title through Porter's sale, under the decree in 1843, and secondly, prescriptive title, under the deed made by Porter as color, with more than seven years possession thereunder. The jury, under the charge of the court, found for the defendant, and a new trial being refused, the plaintiff here and below excepted, and the question is, do the facts put the legal title in the plaintiff or in the defendant?

1. So that the first question is, did the court of equity of Chatham county have jurisdiction to decree the sale of this city lot so as to divest the title of Louise O'Byrne, in 1843, twelve years before her birth? It was an *ex parte* bill—it was not filed in office thirty days before court—neither the Irish relatives nor James Jeremiah, through a guardian *ad litem* or otherwise, were made parties, or served with notice of any sort; and the proceeding thus appears irregular in some respects. But a regular trial by jury was had, a decretal verdict was rendered, the verdict regularly entered on the minutes of the court, and those minutes signed by the judge of the court—the chancellor who presided on the trial. Was the court without jurisdiction, and the decree, therefore, void? or were the proceedings merely irregular, and, therefore, good, unless set aside by a proceeding instituted regularly in the court which authorized the trial and sanctioned the proceedings? If not void, it could not be collaterally attacked. Code, §§3593, 3594. So that it appears plain from the above cited sections

of our Code, that if the court had jurisdiction, the decree is not void, and could only be attacked where rendered; for unquestionably it is of equal force with a judgment. Code, §§4212, 4217, 4219.

Did the chancery court have jurisdiction? It has ever been held in Georgia, so far as we know or are advised, that the jurisdiction of chancery was co-ordidate with the ordinary's on the matters of distribution of estates. Indeed, the exclusive jurisdiction given to the ordinaries touching administration is first found in the Code; Prince's Dig., 243; Cobb's Digest, 319, 323. And now, even after such jurisdiction is given, it does not oust the jurisdiction of equity in matters of distribution. Code, §§2600, 3144, 3145. Such has ever been the law in this state and elsewhere where English equity powers and practice prevail. Story's Eq. Jn., §530 to 534, 542–543 ; Adams' Eq., 250, n. 1 ; 14 *Ga.*, 323; 23 *Ib.*, 35 ; Wait's Actions and Defenses, 207 ; 19 Ala., 438 ; 52 *Ga.*, 153.

The court, therefore, had jurisdiction of the subject matter. Did it have jurisdiction of the person? Certainly it had of this executor; for he lived in Chatham and obtained letters there. It had of the plaintiff's testatrix ; for she could be represented only by this executor. The petition or bill was filed and the decree had twelve years before her birth ; therefore, it would be folly to have a guardian *ad litem* appointed for one unborn. Service on her then infant father would have been none on her, and in no sense could she have been represented by him ; for she did not hold by descent, but purchase. She held under her grandfather's will, and not by descent from her father. There is no privity of estate between them—nor could she have been represented by the Irish legatees or devisees in contingent remainder or by executory devise; for her birth annihilated their estate, and she was born to their destruction. No privity was ever between them. So if her father had been made a party, or the Irish relatives parties, still she would not have been concluded because they were parties ; for neither

was her ancestor as to this property. She must, therefore, have been represented by the executor; for no other living being could have acted for her; and if he could not and did not act for her, and represent her, there could have been no execution of this will by the sale of land charged to pay the debts and legacies. But he did represent her—61 *Ga.*, 384–2; 5 Paige's Chan., 215; 48 *Ga.*, 342. Therefore, the court had jurisdiction of the person of the executor, and of the unborn infant; and therefore the decree is not void for want of jurisdiction, and therefore it cannot be attacked collaterally. Code, §§3593–4.

Besides all this, the case peculiarly required chancery interposition. The estate owed a debt secured by mortgage —the executor had borrowed money to pay it—eighteen hundred dollars was due thereon—the five thousand dollar legacy was unpaid and could not be paid without the sale of real estate, the life interest in that real estate belonged to a ward in chancery—an infant—the remainder interest might be in the Irish devisees, and probably was there as a bare fee—subject to be destroyed by the birth of a child to this infant in years to come—all the land was charged to pay debts and legacies, and it would seem from this review that equity alone had full power over the premises. It is conceded that if the ordinary had granted leave to sell, the infant unborn would have been bound by his order; if, then, equity had even concurrent jurisdiction, the unborn child was also bound.

It is conceded, too, that equity would in England have jurisdiction over personalty situated as this estate was; if so, the act of 1821 having put realty and personalty on the same footing for distribution in Georgia, equity here would have jurisdiction to decree the sale in question. Cobb's Dig., 293.

But the truth is, that this plaintiff's testatrix was, by the will, but a residuary devisee—she took only what was left after the payment of all debts, and of these legatees, and of the expenses of the support and finished Catholic education of

her father; and the whole estate was bound for the first two objects at least, and the entire income was her father's for life. The title was in the executor to the entire property, for certain great trusts, until her birth. See 46 *Ga.*, 247, where this principle seems to have been distinctly recognized in a case somewhat analogous. And it must be so to carry out the will. It is folly to charge land with the payment of debts and legacies, and yet give no power to the executor—vest no title in him—to carry out the will, and pay the debts and legacies. The life tenant took subject to this charge, and makes no complaint ; the legatees in Ireland took a contingent remainder or base fee, subject to be divested by the birth of James Jeremiah's child, less this charge to pay their own legacies, which they got and could not complain, had their estate never been destroyed by the contingency of the birth of Louise ; and when she was born what she got was subject to, and the residue left after, payment of these debts and legacies—and she cannot complain. We hold, therefore, that the title of the defendant is good to this lot of land against her and her executor, and that the verdict and judgment are right on the first ground set up by defendant, that absolute title passed to it and its grantors by the sale under the decree in 1843.

2. This makes it unnecessary to elaborate the other defense—the title by prescription. That is equally good. For if the purchaser held adversely to the executor, he held adversely to the infant whom that executor represented ; for he represented all who took under this will until the remainder was determined by the birth of plaintiff's testatrix, and he assented to the devise. Code, §2451. This *dictum* must have sprung from the act of 1821, for the reason is that realty, as well as personalty, is assets to pay debts. Where the title at law is in the infant, the statute does not run against her ; but if in the trustee, it runs against him, and, therefore, against her—8 *Ga.*, 1—and following cases down to 61 *Ga.*, 54.

The title was in this trustee and must have been in order

to execute the will—to see to the education, religious and secular, of James Jeremiah—to pay the debts and legacies—to divide the legacies among survivors to determine who were the survivors to take the absolute fee in remainder if James Jeremiah died without children—and to preserve the estate until these questions were settled by the birth of Louise, the plaintiff's testatrix. We are clear, therefore, that the court was right on both defenses, and the judgment is affirmed.

See 3 *Kelly*, 256; 10 *Ga.*, 361; 55 *Ib.*, 28; 23 *Ib.*, 31; 61 *Ib.*, 77.

Judgment affirmed.