DEAN, executor, *vs.* FEELY *et al.*

[This case was argued at the last term, and the decision reserved.]

1. The case between these parties has been twice before this court. It was held, in 61 *Ga.*, 77, that the will of the testator (Lawrence O'Byrne) vested a life estate only in his son (James Jeremiah), with remainder over to the children of the latter; and that, at the birth of his daughter (Mary Louise), the title vested absolutely in her for her own use and benefit, and to be used or disposed of as she might think proper.

(*a.*) Until the birth of such daughter, the title was held to be in the executors of the testator for certain trusts; but that, by her birth, the estate of the ultimate remaindermen was destroyed.

2. When this case was here for the first time, the question of the bar of the statute of limitations was not passed on, because not insisted upon.

(*a.*) This court has held that, upon the birth of a child to the son of testator, the trust, or *quasi* trust, ceased; the control of the executors terminated, and the remainder in fee vested in such child.

(*b.*) In the case in 64 *Ga.*, 676, it was ruled that the title on which prescription was founded, having been acquired before the birth of a remainderman, such birth did not suspend the prescription. This harmonizes with 61 *Ga.*, 77.

3. The second question made by defendant's bill of exceptions has been twice before this court in this case, and was in both instances ruled adversely to the position now taken by them. The questions then considered as to these parties are *res adjudicata* and final. 61 *Ga.*, 77; 66 *Ib.*, 273.

4. Since the adoption of the Code, there has been no statute of limitations in this state in respect to actions to recover realty; nor were such actions included in the limitation act of March 16, 1869.

(*a.*) If the act of 1869 were applicable, the lessor was a minor when her right of action accrued, and so continued to the time of the commencement of this suit; nor does it appear when a guardian was appointed for her. She would not, therefore, be barred.

5. Where a tenant for life, as such, makes valuable improvements upon the land during his occupancy, these improvements are not a charge upon the property when it comes to the remainderman. Where improvements of a permanent character are made in good faith by one who has no claim of right to the possession, but is a tenant by sufferance only, the value of such improvements may be allowed to the extent of the rent found to be due for the use of the land, but no further. But where the premises are held *bona fide* under independent and adverse claims of title, then the party making such improvements is entitled to have their full value allowed him.

(*a.*) Our Code makes a distinction in regard to setting off improvements against mesne profits between one who is *bona fide* in possession under claim of right, and a mere trespasser. In the latter case, mesne profits are not to be reduced below the sum which the premises would have been worth without such improvements ; in the former case no limit is fixed.

6. A defendant in ejectment may claim compensation for improvements made by his predecessor in the title, under whom he holds by warranty deed, as fully as such warrantor could have done.

7. A defendant in ejectment cannot be compelled to pay an enhanced amount as rent in consequence of his own improvements.

(*a.*) Whether a defendant in ejectment may have a verdict for the excess in value of improvements over rents, which shall constitute a lien on land to the extent of such excess, is not decided, as not being made by the pleadings, or passed upon by the court below.

8. The verdict was right under the evidence.

9. The testimony of Wyly was properly admitted. He was not a party to the record ; and had he been, he was competent to testify to matters not transpiring between himself and deceased.

February 13, 1883.

Wills. Estates. Title. Prescription. Statute of Limitations. Mesne Profits. Set Off. Witness. Before Judge TOMPKINS. Chatham Superior Court. June Term, 1882.

In 1875, ejectment was brought, on the demise of Mary Louise O'Byrne, against Feely *et al.*, as tenants in possession. There were two counts in the declaration. The first alleged the lease and ouster in 1861 ; the second was for mesne profits from that time. Pending the suit, the

plaintiff's lessor died testate, and Dean, her executor, was made a party plaintiff. Defendant pleaded the general issue; prescriptive title; the general statute of limita· tions; the statute of 1869; set off of improvements placed on the land, and of taxes and insurance paid in connection therewith against mesne profits; and estoppel because of assets received by the lessor of the plaintiff from the warrantor under whom the defendant held.

The case has been twice in the Supreme Court, and will be found reported in 61 *Ga.*, 77, and 66 *Ib.*, 273. The facts are, in brief, as follows: Lawrence O'Byrne died, leaving a will, which was probated July 12, 1836. After giving certain specific bequests, the fifth and sixth items were as follows:

" 5th Item.—I give and bequeath unto my son, James Jeremiah (after paying the above named legacies), the whole of my real and personal estate, consisting of houses, lands, tenements, negroes, etc., as will appear by deeds and titles in my possession, to have and to hold the same for his use.as specified in the following, viz : to receive all the proceeds of the rents, interest, etc., which may accrue from the property for his own and special use, after deducting the necessary expenses on the same property ; but in no case whatever shall he be allowed, until he shall have arrived at the age of twenty·one years, the control or management of the said property or estate, but allowed such sums of money as my executors may deem necessary for his education and maintenance. I further command that my son, James Jeremiah, shall not have the power of disposing or selling the above property during his natural life, his possession or benefit of the same being but for his natural life. But in the case of any lawful issue by him, then the same shall descend to his child or children, for their use and benefit, and to be used or disposed of as they may think proper or fit. But in the event of no lawful issue from him, the other named property shall be equally divided among my relatives named in this will.

6th Item.—I request of my executors to pay particular attention to the education of my son, James Jeremiah ; to see that he is properly instructed in the faith of the Roman Catholic Church, and to receive a finished education in some Catholic college in the United States."

Anthony Porter was appointed an executor, and managed the trust in the will until James J. O'Byrne, the son

of the testator, became of age, when, on January 10, 1855, he turned over to said James J., the residue of the property, including this lot, and took his receipt for it "as my own." On January 17, 1855, Porter filed his final account, in which he stated that this lot "was delivered over to James J. O'Byrne, the son and heir at law, under the will of deceased." Other receipts, given to Porter by O'Byrne about this time, described the latter as "son and only legatee." Subsequently, Porter was discharged as executor, it appearing that "said estate has been fully closed up, as appears by the returns duly filed." But he obtained no discharge as trustee.

Mary Louise O'Byrne was born December 12, 1855, and died July 7, 1876. She was the only daughter of James Jeremiah O'Byrne, who died September 27, 1860. He left a considerable amount of property, to which Mary Louise was one of the heirs at law; but it was consumed or disposed of before the commencement of this suit.

James J. O'Byrne, having taken possession of the lot as his absolute property, permanent, valuable improvements were afterwards erected thereon. After these improvements had been placed on the premises, he sold the lot and improvements on the 9th day of February, 1858, giving a fee simple title, with warranty, to William Wright, for ten thousand dollars. Wright, on the 2d day of July, sold one-half interest in the same to George W. Wylly, giving a fee simple title, with warranty, for six thousand dollars; and he sold the other half, giving a similar title, with warranty, also to George W. Wylly, on the 3d day of January, 1860, for six thousand dollars. Wylly had no notice of any defect in the title till the bringing of this suit.

On the 24th day of January, 1860, he sold the entire lot and improvements, giving a fee simple title, with warranty, to William H. Wiltberger, who died testate, leaving R. J. Davant his executor. Possession accompanied each conveyance.

Prior to the possession of the premises by James J. O'Byrne, they were in a very bad condition ; some of the witnesses testified that at times the lot was a nuisance, and that as a source of income it was worthless. For a time it had been rented for $200.00, and later, for $250.00 a year. There was an old small stable upon it, which required the expenditure of about $30.00 a year to keep it up. Since the improvements were put upon the lot, it has been valued at from $8,000.00 to $12,000.00, and the improvements have been valued at from $3,500.00 to $5,000.00.

There was other testimony showing the amount of taxes paid, etc., not material here. Pending the action, Wylly, who was the warrantor of Wiltberger, re-purchased from the latter for $8,000.00.

There was some testimony tending to show that certain land in Liberty county had been given to James J. O'Byrne in part payment for this lot, and it was sought to trace this into the hands of his administrator.

At the close of plaintiff's evidence, defendants moved for a non-suit on the following grounds :

(1.) Because the evidence disclosed the fact that the legal title to the property in dispute was in Anthony Porter, as trustee, and so continued, and had not vested in the said Mary Louise O'Byrne at the time of the demise laid in the declaration, nor at any other time prior to the commencement of this suit.

(2.) Because defendants and those under whom they claim, had acquired a complete title by prescription to the said premises prior to the commencement of said action.

(3.) Because the right of action set forth in said suit was barred by the act of the general assembly, approved March 19, 1869, having accrued prior to the first day of June, 1865.

The non-suit was refused, and defendants excepted *pendente lite.*

The jury found for the plaintiffs, without mesne profits. Plaintiffs moved for a new trial on the following among. other grounds:

(1.) Because the verdict is contrary to law and evidence.

(2.) Because of various charges and refusals to charge, which it is unnecessary to set out in detail; but the view taken by the court may be gathered from the following charges on this subject:

"If you believe that the defendants are trespassers on the land—that is, that they went into possession not *bona fide*, in good faith, claiming and believing that they had a right to the land as against the plaintiff, then this is the rule of law in arriving at and fixing mesne profits. [The court here read section 3468 of the Code of Georgia, 1873; also the fourth head-note in *Beverly & McBride vs. Burke*, in 9 *Ga.*, p. 440 ] That is, although you might find that the permanent improvements and repairs put on the land by those holding adversely to plaintiff, are greater than the amount of profits yielded by the premises (the land and the improvements), to the defendants since January 3, 1861, yet the defendants would be liable to pay now, as mesne profits, what the land was reasonably worth without such improvements.

"If the defendants were trespassers, and the value of the improvements and repairs is not now as great as the rents and profits that have been received from the rent, use and occupation of the land and improvements from January, 1861, up to this date, then the sum allowed as mesne profits should be the difference in those two amounts.

"If, however, the defendants and those under whom they claim, in good faith, bought the land from the father of Mary Louise O'Byrne, believing he had full right to sell and make the deed he did make, and being so in possession *bona fide*, improved the land by putting buildings upon it, then the rule for recovering mesne profits is as follows: (I read sections 3356 and 2906 of the Code.)

. "I construe the law to be this : If you find from the evidence that the defendants, and those from whom they purchased or leased, were *bona fide* buyers and holders of the land, under a claim of right and title, then you are to estimate from the evidence what the rents and profits of the land, as it stood when J. J. O'Byrne sold it, would have realized from January, 1861, up to this date, not counting in the rents and profits of the whole premises, with the improvements put there since O'Byrne sold the land, but looking to the land alone. To this amount of rents and profits that you find the land itself would have brought, you can, if you see proper, add interest on the various amounts as they from time to time accrued, and take the whole sum, less the amounts shown to have been paid for taxes upon the lot itself without the improvements, and this you can take as the value of the mesne profits, subject to a set-off of the present value of the improvements now upon the land, and put there by defendants and those under whom they claim, their agents, servants, or lessees."

The motion was overruled, and plaintiffs excepted. Defendant also assigned error both in the refusal to grant a non-suit, and on various charges and refusals to charge not material here.

John G. Clark ; Lester & Ravenel ; Geo. A. Mercer ; James Atkins, for plaintiffs in error.

Chisolm & Erwin ; J. R. Saussy ; W. H. Wylly, for defendants.

Hall, Justice.

The bills of exceptions of the defendants, filed *pendente lite*, were brought up in the record, error was assigned thereon, and they were ably and exhaustively discussed here. The questions they make relate exclusively to the titles in controversy, and are :

(1.) That when Mary Louise O'Byrne made the lease to John Doe, on the first day of January, 1861, the legal

title was in Anthony Porter, who was executor of the will of Lawrence O'Byrne, under which she claims title.

(2.) There was no title in her as the plaintiff's lessor at the time of the trial, as she was then dead; that she left a will, by which she conveyed whatever title she had to Dean, the executor named in her will, to be held upon certain trusts; that he took by purchase and not by descent; that she, having conveyed her title pending the suit and before the trial, there could be no recovery on her demise.  It was insisted further, that the legal title was still in Porter, who, as the executor of Lawrence O'Byrne, remained the trustee of Mary Louise until his death, which occurred in December, 1869, and that the defendants acquired a good prescriptive title.

(3.) That inasmuch as the lease was made January 1st, 1861, and the ouster was prior to June 1st, 1865, and the suit was not commenced until October 1st, 1875, the case is barred, upon the face of the pleadings, by the act of the general assembly, approved March 16th, 1869.

1. The case between these parties has been twice before this court, at the August term, 1878, and the judgment of the court will be found in 61 *Ga.*, 77.  This court then held that the will of Lawrence O'Byrne vested a life estate only in James Jeremiah O'Byrne, with remainder over to his children; that at the birth of Mary Louise O'Byrne, the title vested absolutely in her for her own use and benefit, and to be used or disposed of as she might think proper; in other words, that she was to have the absolute dominion over it, and might dispose of it as she saw fit and proper.  In another case upon this will (64 *Ga.*, 676), this court held that the title was in the executor of Lawrence O'Byrne, for certain great trusts, until the birth of Mary Louise.  Further, that the estate of the ultimate remaindermen under the will was destroyed by her birth; that the title was in this trustee (evidently meaning executor, and using the term "trustee" in its broad and popular, rather than in its strict, legal and technical sense), and must have been, in order to exe-

cute the will—to see to the education, religious and secular, of James Jeremiah ; to pay the debts and legacies ; to divide the legacies among survivors ; to determine who were the survivors ; to take the absolute fee in remainder, if James Jeremiah died without children, and to preserve the estate until these questions were settled by the birth of Mary Louise.

2. It is true that when this case was first before the court, it did not pass upon the question of the cause of action being barred by the statute of limitations, because it was not then insisted on.  61 *Ga.*, 85.  And it is also true, that in the case in the 64 *Ga.*, 676, this court held, that the defendants in that case acquired a good prescriptive title. Whether or not the defendants here could acquire such a title  by prescription, depends  altogether upon the termination of the executor's control, as trustee, over the title. According to both these cases, this trust terminated upon the  birth of  Mary Louise ; the remainder in fee then vested in her.  In the strong language of  Warner, Chief Justice, in the first case, she then had "absolute dominion over it," to do with it as she " should think fit and proper." And in the last cited case, it was ruled that this trust continued only until the birth of Mary Louise.  The title, in that case, was acquired before her birth, and the prescription  began to run during  the existence of the trust, and when it once commenced to run, nothing but  the  causes mentioned in the statute could suspend its operation ; and the birth of a remainderman is not among  these.  Code, §§2686–2688.  So that these decisions are in entire accord with each other, and  effectually dispose of  this question.

It may well be doubted, if a naked  executor, except in a qualified  sense and  to a limited extent, can  even be regarded as a technical trustee ;  but be this as it may, this executor had assented to  this legacy, and turned it  over to James Jeremiah O'Byrne on the 10th of January, 1855, prior to the birth of Mary Louise, and about the time of her birth, in December, 1855, was discharged by the court of ordinary from the administration of the estate, he having

previously thereto made a final settlement of its affairs.

3. The second question made by the defendants' bill of exceptions, has been twice before this court, in this case, and in both instances ruled adversely to the position now taken by them. These rulings preclude any further consideration, both of this and the other questions considered. As to these parties, they are *res adjudicata* and final. 61 *Ga.*, 77, 2d and 3d head-notes ; 66 *Ib.*, 273.

4. Neither do we think the act of limitations of the 16th of March, 1869, applicable to this case. It has frequently been decided by this court, that acts of limitation do not embrace prescription; the state is within the statute of limitations, but at the September term, 1881, it was decided in two cases that no prescription runs against the state. *Glaze vs. The Western and Atlantic Railroad Company ; Kirschner et al. vs. The Western and Atlantic Railroad Company*, 67 *Ga.*, 760, 761. In *Pollard vs. Tait*, 38 *Ga.*, 439, it was held, that since the 1st of January, 1863, when the Code went into operation, there has not been any statute of limitations in this state as to suits for real property. In *Lopez vs. Downing et al.*, 46 *Ga.*, 125, McCay, J., says that it was not the intention of the codifiers to include the action of ejectment in the statute of limitations, and that it is not within the act of the 16th of March, 1869. Compare 47 *Ga.*, 302.

The plaintiff's lessor was a minor at the commencement of this suit in 1875. When a guardian was appointed for her, does not appear. This court, in *Lake vs. Hardee*, 57 *Ga.*, 459, 467, held that the limitation act of 1869 does not bar a minor—certainly not a minor with no guardian, and cites 45 *Ga.*, 478. Adopting the rule laid down in *Jordan vs. Ticknor et al.*, 62 *Ga.*, 123, which is distinguished from the two last cases, and admitting this cause of action to be within its provisions, the lessor of the plaintiff would not be barred under the act of the 16th of March, 1869. Her suit was brought before she attained her majority,

v 69—52

and that case held that she had nine months and fifteen days, after the removal of the disability of infancy, in which to bring it under that act. The result is, that the judgment of the court below, excepted to by the defendants *pendente lite*, must be affirmed.

5. The exceptions taken by the plaintiffs relate principally to mesne profits, the interest thereon, the allowance of improvements and taxes as sets-off to the same.

There were various requests to charge upon the subject refused by the court, to which exception was taken, and also various charges given by the judge, as will appear from the record in the case. In the view we take, a critical examination of this charge is deemed unnecessary. It was fully as favorable to the plaintiff as it could be under the law, and if there are portions of it to which the defendants might have excepted, they have not seen proper to do so. They make no complaint by any cross-bill of exceptions, and we are not called upon to consider any alleged errors, if such there be, at their instance. The main contention was that James Jeremiah O'Byrne, and those holding under him, held the premises tortiously as trespassers; and if he was not a trespasser, then he held only as tenant for life, and all the improvements, or a greater part of them, having been put on the lot during his life, either by himself or those claiming under him, as purchasers or tenants, they inured to the benefit of the remainderman. Both these questions will be considered together. How did James Jeremiah O'Byrne receive and take possession of this property? Did he take it as tenant for life, or as owner in fee? Did Anthony Porter, the executor of Lawrence O'Byrne, assent to this bequest and turn it over to the divisee as an estate for life, or as absolute owner of the entire fee? We entertain no doubt, from Porter's returns to the court of ordinary, from his dismissal by the ordinary from the administration upon a final settlement of his accounts, before the birth of Mary Louise, and from the terms of O'Byrne's final receipt to

him for the estate as his " own property," from the man-
ner that O'Byrne dealt with the property as long as he
lived, especially his conveyance of the fee in the same to
Wright, that the one considered that he was consenting
to, and delivering, and the other that he was receiving the
entire fee.    But suppose they were both  mistaken in the
construction they placed upon Lawrence O'Byrne's will,
as it seems they were, does this make James Jeremiah's
holding that of a trespasser, and is it to be thence inferred
that he acted in bad faith?    We think not.    In *McPhee
vs. Guthrie & Co.*, 51 *Ga.*, 83, one who held under a void
title,  but who purchased and paid his money in good
faith, believing that he acquired a valid estate, although
he was mistaken as to law under which his title was sup-
posed to accrue,  was held to be a *bona fide* possessor of
the premises, and entitled to compensation for the im-
provements he put upon the land, and this, too, against
encumbrance of a mortgage, where the holder of the same,
either by himself or representative, had no agency what-
ever in misleading him.    Note to Jackson *vs.* Loomis, 15
Am. Dec., 351.    James Jeremiah O'Byrne did not place
improvements on this lot, or cause them to be placed
there, under the apprehension and belief that they were
to inure to any remainderman ; he had no such thought
or intention.    He was not improving for those to come
after him, but was improving for himself.    No case or au-
thority has been shown us where, under such circumstances,
a remainderman could invoke the principle laid down, in
his aid.    The case of  Merritt *vs.* Scott, 81 N. C. R., 385,
cited by counsel for plaintiff, so far from sustaining,
pointedly negatives the position taken by him.    Smith,
C. J., who delivered the opinion of the court, says:    " We
think it clear that improvements of any kind put upon the
land, by a life tenant during his occupancy, constitute no
charge upon the land when it passes to the remainderman.
He is entitled to the property in its improved state, with-
out deduction for its increased value by reason of good

management, or the erection of buildings by the life ten-
ant, for the obvious reason that the latter is improving his
own property and for his own present benefit. This
proposition is too plain to need the citation of authority.
For subsequent rents and uses, he is entitled to have the
amount reduced by those improvements. Suppose, while
holding over, the defendant had, by such improvements
as in the answer are alleged to have been made, rendered
the land more valuable as it comes to the remainderman,
would it not be reasonable he should pay a smaller rent
than if nothing of the kind had been done? So, if no
repairs were made and the buildings had gone to decay,
and by mismanagement and bad cultivation, the farm had
been abused and its value impaired, a full and larger rent
might justly be required of the tenant.

" The evidence of such improvements as were made by
the defendant, after the estate expired and he became
chargeable with the rent, ought to have been admitted and
considered by the jury in measuring the value of the rent
and in mitigation of damages. The evidence was compe-
tent for this purpose only, and not, in case the improve-
ments were worth more than the rents, to constitute a
counter-claim for the excess. The rule is thus stated by
Mr. Tyler: 'The defendant should be allowed the value
of his improvements made in good faith to the extent of
the rents and profits claimed, and this is the view of the
subject supported by the authorities.' Tyler on Eject.,
849. Referring to the action for mesne profits, which
might be brought after a recovery in ejectment, Ruffin,
C. J., uses this language: 'The jury can then make fair
allowance out of the rents, and to their extents, for per-
manent improvements honestly made by the defendant
and actually enjoyed by the plaintiff, taking into consid-
eration all the circumstances.' Dowd *vs.* Faucett, 4 Dev.,
92. 'Thus far the jury should have been allowed to hear
and consider the evidence in assessing the sum which the
defendant should pay for the use of the premises, for it is

quite apparent the improvements were made in good faith, and will enure to the plaintiff's benefit. As a counter-claim, and to charge the land therewith when the estate in remainder is vested in Deborah (the remainderman), the evidence is totally inadmissible under the act of February 8, 1872. Bat. Rev., Ch. 17, §262 (*a*), and the sections following. The act is not applicable to a case like this, but to independent and adversary claims of title, and was intended to introduce a just and reasonable rule in regard to them. The owner of land, who recovers it, has no just claim to anything but the land itself, and a fair compensation for being kept out of possession; and if it has been enhanced in value by improvements made under the belief that he was owner, the increased value he ought not to take without some compensation to the other. This obvious equity is established by the act."

This case is recited at such length, because of its entire coincidence with what we believe to have been the principles of equity as they existed prior to our adopting statute, and with what we are sure has been settled by our own decisions, and the provisions of our Code upon the subject. It establishes three things:

First. Where a tenant for life, as such, makes valuable improvements upon the land during his occupancy, these improvements are not a charge upon the property when it comes to the remainderman.

Second. Where improvements of a permanent character are made in good faith by one who has no claim of right to the possession, but is a tenant by sufferance merely, the value of such improvements may be allowed to the extent of the rent found to be due for the use of the land, but no further.

Third. Where the premises are held, *bona fide*, under independent and adversary claims of title, then the party making such improvements is entitled to have their full value allowed him.

*Beverly vs. Burke,* 9 *Ga.*, 440, thus lays down the law : "Against a claim for mesne profits in the nature of damages, the value of the improvements made by the defendant, is a fair set-off, provided he took possession of the premises *bona fide.* Trespassers are not entitled to the benefit of this principle, except where the profits of the premises have been increased by the repairs. or improvements which have been made. In that case, it is proper for the jury to take into consideration the improvements or repairs, and diminish the profits by that amount, but not below the sum which the premises would have been worth without such improvements or repairs."

Following this decision, the Code announces the rule for our guidance and direction in both the cases put in the above extract : "A trespasser cannot set off improvements in an action brought for mesne profits, except when the value of the premises has been increased by the repairs or improvements which have been made. In that case, the jury may take into consideration the improvements or repairs and diminish the profits by that amount, but not below the sum which the premises would have been worth without such improvements or repairs." Code, 3468.

Now, compare this with Code 2906 as follows : "Against a claim for mesne profits, the value of improvements made by one *bona fide*, in possession under a claim of right, is a proper subject matter of set-off." No conditions what ever are annexed to the set-off of one *bona fide* in possession under a claim of right, who has made improvements ; none such, at least, as appears in the last section of the Code above cited, as that the improvements or repairs may diminish the amount of the mesne profits only to what the premises would have been worth had not such improvements and repairs been made.

We have shown that James Jeremiah O'Byrne and those claiming under him, held this property in good faith, believing that they had title to the entire fee, and that

the improvements made by them were made under this belief.

What improvements were on these premises when O'Byrne took possession by the assent of his father's executor? Nothing but a cow shed and a privy. All the improvements subsequently made were put there by O'Byrne and his tenants, or those deriving title from him and their tenants; they all held by what they supposed was an independent and adverse title to this present plaintiff and his testatrix, and there seems to have been an acquiescence in this claim from 1855 down to the bringing of this suit in 1875, a period of more than twenty years. The fact that the plaintiff was an infant after her birth in 1855 until the commencement of the suit in 1875, cannot change the character of their holding, so far as to affect the good faith and claim of right under which they held, and in accordance with which, from time to time, the improvements and repairs were made.

It was insisted, however, in argument, that after the suit was commenced, or if not then, after the decision was rendered by this court, in 61 *Ga.*, 77, the defendants ceased to be holders *bona fide* and under claim of right, and were thenceforward liable for the full rent of the premises in their then improved condition with interest thereon; that Wylly, who was the landlord of the defendant, Feely, and who claimed to have title to the entire fee, then knew that his title was " bad;" that from that time he held in bad faith, and as a trespasser. It is true, that Wylly testified that he first knew that his title was " bad " when the suit was commenced, but it is evident from the connection in which the word " bad " was used, he meant to say nothing more than that his title was then, for the first time to his knowledge, called in question. The decision of this court, in the case, did not place the defendants in the condition contended for, as it did not cover all the questions made by the defence; it did not, as we have seen, decide the questions arising upon

the plea of the statute of limitations. Those questions were left open by the express terms used in that decision. " The question," says Warner, C. J., delivering the opinion of the court, " as to the cause of action being barred by the statute of limitations, was not insisted upon here, and we express no opinion upon it," and it remained open until the trial we are now reviewing.

Apart from these special circumstances, we deny the correctnesss of this position upon general principles. In *McPhee vs. Guthrie,* already cited, after reviewing the two sections of the Code above set forth, Warner, C. J., says (51 *Ga.,* 88) : " The equitable right of a trespasser, to be allowed the value of his improvements made on the land, where the value of the premises has been increased thereby, is clearly recognized by our law, as well as where the improvements have been made by one acting in good faith under a claim of right, as in this case. But this is not a new principle introduced into our Code ; it was a principle recognized by the courts of equity in England long anterior to 1776. In looking into Viner's Abridgment (volume xviii, new edition, 124), we find two cases reported, in which purchasers were allowed compensation for improvements, one of which was made without notice of any incumbrance, the other with notice. In the case of Peterson *vs.* Hickman, 'the husband made a lease of the wife's land to one who was ignorant of the defeasible title ; the lessee built upon the land, and was at great charge thereon. The husband died, and the wife avoided the lease of the land, but was compelled, in equity, to yield a recompense for the building and bettering of the land, for it was so much the better worth unto her.' In Walley *vs.* Whaley, 'a purchaser who, before his purchase money paid, or deed executed, though not before his contract was made, had notice of a prior settlement, was ordered to be allowed what he had laid out in lasting improvements upon the tenements, though made pending the suits.'" After showing that the parties in the case

then before the court, though not within the words of the
law allowing sets-off against claims for mesne profits,
were within its principle, the Chief Justice continues
(p. 90.): "We have already shown by the sections of the
Code before cited what is the policy of the law as to mak-
ing compensation for improvements made on land, in a suit
by the party having the legal title, where such improve-
ments have increased the value of the premises, even in
the case of a trespasser. The claimant in this case was
not a trespasser. He purchased the lot in good faith, and
went into possession of it under color of law and claim
of right. He was not a mere wrong-doer in taking pos-
session of the lot and putting improvements thereon, and
it would seem that the plaintiffs should be contented with
making him lose the original purchase money paid for the
lot, by the sale of it for their benefit, without seeking to
take from him the value of his improvements, and have
the same appropriated to the payment of their debt, to
which they have no just or equitable claim."

This claim to set-off improvements and repairs by a mere
wrong-doer, and actually fraudulent holder, who was fully
charged with notice, against mesne profits, was allowed by
the Supreme Court of the United States, in a case arising
under the principles of the civil law. Jackson *vs.* Ludeling,
99 U. S. 513. The doctrine is an equitable one, and was
doubtless borrowed from the civil law and incorporated
into the English system of equity jurisprudence. See note,
15 Am. Ed., 344. This case of Jackson *vs.* Ludeling is
perhaps an extreme case. Mr. Justice Field dissented
upon the sole ground, to use the words quoted by him,
that the possession was acquired and held by "a rank
and abominable fraud." The same high court, in a for-
mer case between the same parties, had held these per-
sons "possessors in bad faith, having obtained control of
the property fraudulently." We need not, nor do we go
so far as that high tribunal. We have no such case
before us, in any view that may be taken.

6. It was further insisted on in the argument, that the present parties could not claim compensation for improvements made by their predecessors in the title under which they claim, but if such predecessors could have been allowed compensation for improvements made in their time, and these present defendants have their warranty of title, they may avail themselves of the same right. *Willingham vs. Long*, 47 *Ga*, 546 ; *Jenkins vs. Means*, 59 *Ga.*, 55.

We have shown that James Jeremiah O'Byrne held under a title independent of and adverse to the plaintiff, and so far as the judge's charge directed the jury to assess rents upon the property, as it was improved in the time of his holding, it was erroneous and more favorable to the plaintiff than it should have been; they should have been instructed, in making their estimates of rents, to regard the property as it was improved at the time his title accrued and he took possession.

7. The plaintiff excepted to so much of the judge's charge as confined the jury to an estimate of rents upon the property as it stood when the defendant's title accrued, and insists that they are entitled to have the rents yielded by the estate in its improved condition. To this view we cannot give our sanction. We hold with Savage, C. J., in Jackson *vs.* Loomis, 4 Cowen, 168, that the defendant "most clearly should not be compelled to pay an enhanced rent in consequence of his own improvements." Sedgwick & Wait, in their work on Trial of Title to Land, §678, after reviewing the authorities upon this subject, thus sum up the result: "The principle of law which prohibits the true owner from recovering as mesne profits the increase of income resulting from improvements made by the occupant, is manifestly just and equitable. It cannot be said that the additional profits are taken from the owner's land ; on the contrary, they spring from practically an independent source. While it is true that the improvements pass to the owner by a recovery in ejectment, yet they are the property of the occupant until set

off against mesne profits, or, in some states, till after their value is ascertained, and the occupant's lien upon the land therefor is satisfied." Upon this, as well as the foregoing points as to compensation for improvements, see a very valuable note to Jackson *vs.* Loomis, 15 American Decisions, 349. From the language of our Code, §§3468, 2906, and of this court, in *Beverly vs. Burke*, we think this rule necessarily deducible.

In limiting the set-off in the case of trespassers, the jury cannot go to a greater extent than the sum which the premises would have been worth without out such improvements or repairs; up to this point they may and ought to go, or in the equally clear words of the Code, §3468, "they may take into consideration the improvements or repairs and diminish the profits by that amount, but not below the sum which the premises would have been worth without such improvements or repairs." While this is the rule in the case of trespassers, a more liberal one is prescribed for those who are in possession *bona fide* under claim of right. Their right to set-off is not fettered by any such limitation; it is unconditional and without qualification; and such occupants, in equity and justice as well as upon principle, should hold a better position in this respect than mere wrong-doers.

The defendants have argued their right to have a verdict for any excess in value of improvements over the rents, which should constitute a lien upon the land for the payment of such excess. The pleadings in the case do not make the question, and no ruling of the court below upon that subject is excepted to and brought here for our review; we therefore decline to decide the point.

8. A motion was made for a new trial in this case, upon the further ground that the verdict is contrary to law and evidence and contrary to the justice and equity of the case. A careful review of the evidence had on the trial satisfies us that the jury could have reached no other conclusion than they did, under the principles of law applicable to the case. When O'Byrne went into posses-

sion, the improvements upon the lot were slight and trivial, not worth more for rent, according to some of the witnesses, than ten dollars per annum, and according to others, they were entirely without value for that purpose, while some others rated them higher, on account of their peculiar situation in relation to the city hotel. The witnesses vary in their estimate of the value of the permanent improvements; some of them put them as high as five thousand dollars, while others put them at three thousand dollars; the repairs during this long term amounted to quite a large sum, which was swelled by the city, state and county taxes, that were regularly paid by the claimant; without this last item, however, which the plaintiff claims should not have been allowed as a charge against him, but which we hold to have been a legitimate and proper deduction to have been made from the gross rents in estimating the actual damages which the plaintiff had sustained by the defendant's wrongful holding of the possession (Sedgwick & Wait, Tr. Title to Land, §688), the value of the improvements and repairs was largely in excess of the rents as proved, with the interest accruing thereon, even if interest was to be allowed, about which we decide nothing.

9. Exception was taken to the testimony of Wylly, because it was shown that James J. O'Byrne and Mary Louise were both dead. He was not a party to the record, Code, 3854, and even if he had been, he did not testify to any transaction between him and either of these parties. *Rose vs. West*, 50 *Ga.*, 474, 480.

10. The only remaining exception relates to the testimony concerning the Liberty county lands left by James Jeremiah O'Byrne, which went into the hands of his administrator, and with the value of which it was sought in this proceeding to charge the plaintiff. Whether this was error or not we do not stop to inquire, satisfied, as we are, that if it was error, it was immaterial, and could not, on another trial, change the result.

Judgment affirmed.