POWELL, executor, *vs.* HAMMOND *et al.*

1. The order granting an injunction is to be construed in the light of the prayer for the same. Thus construed, the injunction as to assets not in dispute, was only to restrain the executor from using or disposing of the same otherwise than as directed by the will. This being his duty by law, the discretion of the judge in granting the injunction will not be interfered with.

2. As to the property in dispute on which the injunction operates, namely, the Kennedy note and mortgage, there was no abuse of discretion in restraining any sale or disposition of the same until the title thereto can be adjudicated, the alleged gift by which the executor claims from his father, being suspicious, and his solvency depending apparently upon whether this gift and another, also attacked, be sustained or set aside.

3. The executor being ordered to give bond and threatened with removal, and that a receiver will be appointed, if he should fail to give the bond, these matters are yet *in fieri* and not for review until brought to a conclusion by a positive order.

4. Since the adoption of the code giving the court of ordinary exclusive jurisdiction as to the revocation of letters testamentary, can an executor be removed by any other court, even by final judgment or decree—*quære?* Or can any other court or judge require him to give a bond to the ordinary?

December 19, 1888.

Executors. Practice. Injunction. Receivers. Jurisdiction. Before Judge FAIN. Bartow county. At chambers, September 8, 1888.

By petition to the superior court of Bartow county,

Mrs. Hammond and Mrs. Whitehead alleged as follows; They are daughters of R. C. C. Powell, who died testate on April 21, 1888, nominating Thomas H. Powell, as his executor. The will was probated, and the executor qualified. He made a pretended inventory of the estate and had appraisers appointed, who appraised what was contained in that inventory, which did not contain all of the estate of testator, but only a number of small articles of personalty appraised at $52.40, a note on J. C. Raiford for $15 due November 1, 1888, and a note on D. W. K. Peacock for $2,993.30, (credited by cash paid January 5, 1888, $1,993.30,) and the sum of $3.80 cash in hand. Testator had other effects which were omitted from the inventory. In the summer of 1887, testator sold a farm to Peacock for $5,000. Of this amount $500 was paid by Peacock's assuming a mortgage, and $3,500 was paid in cash before testator's death, leaving $1,000 due by Peacock. Of the amount paid in cash, $1,500 was distributed by testator, before his death, among his five children and a child of his deceased daughter, leaving the sum of $2,000 in his hands, and which has never been accounted for by the executor. Testator was economical, and had no debts of any consequence. Petitioners can learn of no investment made by him except a loan of $300, on January 13, 1888, to S. M., A. B. and Elizabeth Kennedy, for which he took their note due December 1, 1888, bearing interest and secured by mortgage. For several months previous to his death, testator became so enfeebled in body and mind from disease, that he was unable to manage his business affairs. He was residing with Thomas H., and entrusted him largely with the management of his business; and by reason of his feebleness, and the confidence existing between them, Thomas H. acquired a controlling and undue influence

over him, and secured almost unrestrained· control of
the money collected from Peacock. Previous to Janu-
ary 1, 1888, Thomas II. was hard pressed for money
and had very little property; and except the $250 be-
fore mentioned, which had been given to him by his
father in the fall of 1887, he neither owned nor claimed
to own property or money of any consequence. His
wife owned a small separate estate. But shortly after
Peacock paid testator, Thomas H. began to have and
use money freely; he bought a mule, built a new room
to his house, bought new furniture and put up a supply
store, and in March, 1888, paid $1,000 for a forty acre
farm, buying it from Mrs. J. W. Brinsfield. He used
the money of testator in making these purchases, with-
out his valid consent and without regard to his will or
wish. Thomas H. claims all these purchases as his own,
and also that the Kennedy mortgage belongs to him.
Outside of these purchases, he is insolvent; and peti-
tioners are informed that he is trying to dispose of the
Brinsfield land, and fear that he will do so unless re-
strained. They make a similar charge as to the other
property mentioned, and aver that he intends to de-
fraud the legatees under the will, and that he has given
no bond for the faithful administration of the estate.
The Brinsfield farm and the Kennedy note and mort-
gage belong to the estate of testator. Petitioners
pray that defendant be enjoined from disposing of or
creating liens on the land, and from selling or trans-
ferring the note and mortgage; that he be compelled
to amend his inventory by adding to it the note and
mortgage and the balance collected of Peacock after
deducting the amount loaned to Kennedy; that he be
declared to hold the Brinsfield land, the mule, supplies
and supply store in trust for the benefit of the lega-
tees, and the title to all this property be declared to be

in the estate; and that he be removed from the executorship, and a receiver be appointed to take charge of the estate and carry out the will, or, in the event the executor be not removed, he be required to give a bond and proceed to distribute the estate. The 6th prayer was that he be enjoined from disposing of or using any of the funds or property of the estate in any manner other than as directed by the will. There is also a prayer for general relief.

Attached to the petition as an exhibit is the will of R. C. C. Powell, dated March 9, 1887, by which he directs that his debts be paid, and his property, real and personal, be sold; that $300 be paid to his granddaughter, and then all the remainder of the estate be divided equally between his son, Thomas H., three married daughters, and an unmarried daughter, Sallie A.; and appoints Thomas H. trustee of the property given to two of his married daughters, Mrs. Putnam and Mrs Davis.

Defendant answered as follows: The inventory was correct, and nothing was omitted from it which belonged to testator. Peacock did pay $500 by assuming a mortgage, and $3,500 in money, before testator's death; but some time in January, 1888, testator gave defendant $1,000, and on March 21, 1888, testator gave him the Kennedy mortgage by due assignment; and in February or March, 1888, testator and defendant had a settlement, by which it appeared that testator was due defendant $290, and testator gave defendant an order on V. B McGinnis for this amount, which was paid. He denies that he used any undue influence over his father, or that his father's mind was impaired, and denies that the gifts mentioned were not freely and voluntarily made by testator. He claims to own the Brinsfield farm (for which he paid $500 of the $1000 given him by his father and

$500 belonging to his wife), subject to his wife's equity; also the Kennedy mortgage. The mule was bought by him, but has not yet been paid for. The room added to his house, and the furniture, were paid for out of his wife's money, and by the proceeds of his separate estate. He has given no bond as executor, because the law requires none, and testator knew this when he made his will. No part of the money received from his father went into the supply store. He denies any intention to violate his duty, or that he has violated it; and denies insolvency or any intention to sell the Brinsfield farm.

Upon the hearing for injunction, etc., petitioners made the following proof: Up to the time of testator's removal to defendant's house, he and defendant were on unfriendly terms, and the removal was induced by much persuasion on part of defendant. Up to the time of his death, testator had been on the most friendly and affectionate terms with his daughters. For several years before his death, he was a sufferer from nervous dyspepsia, dropsy and affections of the kidneys, and was so enfeebled as to be almost, if not entirely, unfit to manage his business during the last year of his life. His memory failed him, so that he could not remember for any length of time the simplest business matters; and when his spells of suffering were upon him, his mind for days was wandering, and he could not recollect where he was or recognize his most intimate friends. He was confiding in his nature, and easily influenced by those who treated him kindly. Shortly after he went to live with defendant, the latter, in conversation with Hammond, a son in-law of testator, asked Hammond to break up the friendly correspondence between Hammond's wife and her sister, Mrs. Whitehead, then Miss Sallie Powell, and to get rid of one Barksdale, an uncle of testator's children; and said that he (defendant) and Hammond could

"work the thing" to their own advantage, and cut the other children out of anything. Hammond refused, and the subject was dropped. Not long after this, the visits of Hammond and wife, and of her other sisters, to the house of defendant to see testator, were stopped by the extreme coolness and unfriendliness of defendant and his wife, who treated the visitors with ridicule and abuse, defendant, on one occasion, going so far as to tell Mrs. Hammond to go home and stay there, and threatened to strike her with his buggy-whip. He and his wife seemed to look upon the visits with jealousy, and never allowed testator to be alone with his children. A day or two after testator's death, Thomas H. came to the house of Hammond and stated that he knew nothing of the condition of his father's business, or the character of his will, or what Peacock was to pay for the land, or what became of the money; and that all the money he knew of was five or six dollars in silver in his father's trunk. He mentioned no gifts his father had made to him, except a watch, bedstead and bedding, which he said his father gave him at the time he made his will, and that the attention of the witnesses was called to the gift at the time. It was a month or two after this conversation before the other children knew that defendant claimed any gifts of money or notes, except the $250, which sum testator had given to each of his children in the previous November, on which date, when Hammond and his wife went to the house of defendant to receive their share, defendant took Hammond aside and told him he thought Barksdale was advising Hammond and his wife, and that Sallie A. Powell would have to sign the same kind of a receipt Mrs. Hammond did if she got anything, and that Hammond and his wife had better play for what was in sight; also that Barksdale was trying to get it all, but he (defendant) had it where it

was safe, in banks in Savannah, Atlanta and Rome. Before his death, testator frequently spoke of how he intended to divide his property, and always said he intended to divide it equally between his children. Soon after he removed to defendant's house, defendant took Mrs. Hammond aside, upon the occasion of a visit by her there, and told her that if she and her husband would go in with defendant, they would cut out the rest of the children and get all of their father's property themselves. This she refused to do ; and was afterwards treated with unkindness and not allowed to see her father alone, and driven to cease her visits. After the sale to Peacock, testator expressed a desire to distribute $1,500 among his five children and one grandchild, on account of property of his wife, which had gone into his hands. Mrs. Hammond went to defendant's house to receive her share, and then told her father that she supposed that was all she would get, as she had heard that defendant said his father had given him $2,000. Defendant denied this then and there; and testator said he had never thought of such a thing; that he was then giving his children equal shares ; that his will was already written, and it provided that his children should share equally in his estate at his death; and that he intended to keep the balance of his money at interest, which, whenever it accumulated enough to amount to anything, he should divide equally among his children. It was further shown that these shares of $250 each were paid over by defendant, who seemed to have entire control of his father's business, and paid out other moneys for him. Several times during 1887, defendant told one Bostick that testator was not competent to attend to his business, and entrusted it all to defendant; he also told Bostick, a month or two before Christmas, 1887, that testator wanted to distribute $250 to each of his chil-

dren, and that all of them but Mrs. Hammond had humbled themselves to him (defendant) and accepted said $250, and that Mrs. Hammond had better play for what was in sight, as that was about all she would ever get, and that the balance was his. Soon after Christmas, he told Bostick that Mrs. Hammond had humbled herself and taken her $250; and in August, 1888, he told Bostick that he had bought the Brinsfield place and had paid for it. Defendant began to improve his place after his father moved there, and during the summer of 1887 he put up a supply store. A physician deposed for petitioners that while, up to the last two weeks of testator's illness, his mind was not so impaired as to entirely incapacitate him from business, yet his weakness and feebleness were such as in some degree to impair his mental capacity. The defendant settled this witness's medical account, and acted for his father in nearly all witness's business dealings with him, and got the money which he paid for it out of a trunk in his father's room, and appeared to be entrusted with all his father's business. While testator lived with defendant, he appeared to yield to anything requested or required by defendant, and to be much under his influence. Testator owned two mules, one of which he sold for $135 shortly before he moved to his son's, and the other was sold for him by defendant shortly after his removal. Testator was economical and did not spend money foolishly. Mrs. Putnam, one of testator's children, had several conversations with defendant shortly before testator's death, and in none of them did defendant say anything about gifts of property or money to him by his father, other than what was given to the other children. Testator told Mrs. Putnam and her husband, after he sold the land to Peacock, that he intended, after giving his children $1,500, to put the balance of the money at interest,

secured by mortgage on realty, and to live out of the interest, without spending it all, and when it had accumulated, to divide it among his children. Hammond deposed that, in the conversation defendant had with him as to the correspondence with Barksdale, etc., defendant did not tell him that if the correspondence of Mrs. Hammond with Barksdale was broken up the different members of the family would get along better; and further, that there was no such correspondence. At the time defendant told him about the money being in the banks at Savannah, Atlanta and Rome, testator was not apart with defendant, but testator told Mrs. Hammond that his money was in the bank at Cartersville; and when the $250 was paid to Mrs. Hammond, defendant took the trunk key out of his pocket and went and got the money. The tax books of Bartow county for 1887 show that defendant gave in no property, and for 1888, that he gave in between six and seven hundred dollars.

For the defendant it was shown, by his affidavit, that of his wife, and by others, as follows: He did not propose to Mrs. Hammond to go with him into a scheme to cut out the other children. He did not threaten to strike her. Did tell her to go home and stay there, but simply had his whip in his hand and was taking it into the house. Did not propose to Hammond a scheme to cut the other children out or anything of the sort, but told him that testator said that, if the correspondence between Mrs. Hammond and Barksdale was broken up, the different members of the family would get along better; also, at the request of testator, that the money was in the banks, as stated. Never told Bostick that testator was incompetent to transact business. Testator kept the money in his own trunk and kept the key to it, and when he so directed, defendant would get the

money out and hand it to him, or would pay it as directed. Used no undue influence, persuasions, etc. to induce testator to make him gifts. He and his wife stayed in the presence of testator at his special request, because, he said, when they did so, there was less quarrelling at him. Testator's mind was not impaired; he was perfectly sane, acted on his own judgment, was capable to transact business, and did so up to two weeks before his death. Affiants saw nothing to indicate the exercise of undue influence over him by defendant, or to show that his will was not free and sufficiently strong to manage his affairs. At the time testator sold the land to Peacock, he was not living at defendant's house, and defendant refused to advise him one way or the other about selling the land.

Defendant's wife deposed that she never heard defendant say anything about testator's giving him anything; that she was present when testator gave him $1,000.00 in January, 1888; that $500.00 of the money used to pay for the Brinsfield farm were the proceeds of cotton raised on her farm; that the money used in paying for the goods in the supply store was the separate property of deponent; that the stock was not worth more than $175.00 or $200,00; that the $200.00 paid by Peacock, December 31, 1887, was paid over to Sallie Whitehead; that neither deponent nor defendant ever sought to control or influence testator, who kept his own money himself; and that the addition to the house of defendant did not cost over $15.00 or $20.00, which was deponent's money, and her money paid for the furniture mentioned in the bill. Before the Brinsfield farm was purchased, and when defendant was not present, testator spoke of it to a witness as the place Thomas was speaking of buying, and said he thought it cheap at $1,000.00, in which opinion witness concurred.

Testator told a witness, after the purchase of the
Brinsfield farm, that he had given Thomas the-
money to buy it; and at the request of testator, this
witness attested his signature to the transfer of the
Kennedy mortgage, and testator was then sound in
mind, and witness saw nothing to induce him to believe-
that the transfer was not free and voluntary. S. M.
Kennedy testified that, in the transaction in which he
borrowed money from testator and gave a mortgage,
the entire affair was managed by testator intelligently
for himself, when defendant was not present, and had
nothing to do with the loan so far as witness knows;
and the money was taken by testator from his own
pocket and handed to witness. V. B. McGinnis testi-
fied that, in February, 1888, he received a written order
from testator asking him to pay defendant $292.13,
which he owed testator by note and account, and he
paid it; and that the order, note and account have all
been lost or destroyed. Peacock testified, as to the
terms of his trade with testator, that testator managed
all the details of the affair and was careful and pains-.
taking about it; that deponent had heard that testator's
children claimed some interest in this land, and called
attention to this fact, and testator said he would arrange
the matter, and some time afterwards testator returned
and presented papers from each of the children
acknowledging receipt of $250.00 each, for which they
relinquished any claim to a distributive share of their
mother's estate, and an agreement to sign a receipt on
the payment to them of that amount, and all of the
children signed these papers. As late as January, 1888,
Peacock had a settlement with testator, and saw
nothing about him but the same methodical and pains-
taking manner of attending to business which had dis-
tinguished him for thirty years. W. W. Roberts

deposed that, in March, 1888, he sold defendant a mule for $145.00 due. in November. 1888, and. that none of this has been paid.

The presiding judge directed that, within thirty days, defendant execute to the ordinary a bond with security for $2,200, conditioned for the faithful administration of testator's estate; and that upon his failure to give this bond, the court would, by order, upon application from complainant's counsel, remove defendant as executor and appoint a receiver. It was further ordered that the injunction be refused as to the Brinsfield land, the mule, supply store and furniture; and that the injunction be granted as to all the other property mentioned in the petition. To this order the defendant excepted.

MILNER, AKIN & HARRIS, for plaintiff in error.

J. M. NEEL, *contra.*

BLECKLEY, Chief Justice.

1. The injunction granted extends to no property the title of which is in dispute, except the Kennedy note and mortgage. The rest of the property on which the injunction operates is confessedly assets of the testator's estate to be administered; and as the injunction granted is to be construed in the light of the prayer for it found in the petition, we regard the tenor of the injunction respecting the admitted assets to be only a restraint on any disposition or use of these assets other than as directed by the will. See the 6th prayer of the petition. Thus construed, this element of the injunction works no hardship, and calls for no interference with the discretion of the judge. It merely confines the executor to the will, and that is equally his rule of duty with the injunction or without it.

2. The Kennedy note and mortgage are claimed by the executor as his own property. He declines to administer them as effects of his father, the testator, on the ground that they were given to him by the latter before his death. This gift is attacked as procured by fraud and undue influence. Some of the facts and circumstances proved by the affidavits on the hearing render the fairness of the alleged gift subject to grave suspicion, and we cannot discover that the judge erred in granting an injunction restraining any transfer or disposition of these disputed assets until the final hearing of the cause before a jury. Whilst the executor is apparently solvent if his dealings with his father touching this gift and another, which is also attacked for the same reason, should be upheld, a contrary result would render him insolvent, save in so far as the property given, or that into which it has been converted, might be forthcoming to answer for itself on any decree which may be had against him for its recovery.

3, 4. Though we affirm the judgment on the injunction element of the case, we are not to be understood as going further, and taking in the order as to giving bond and threatening removal from the executorship and the appointment of a receiver. We regard these matters as still *in fieri*, and as not yet brought to a final decision.

It deserves inquiry whether, since the code, §331, ¶2, declares that " courts of ordinary have authority to exercise original, exclusive and general jurisdiction of . . the granting of letters testamentary, of administration, and the repeal or revocation of the same," and inasmuch as the old statute (Cobb's Dig. 307), which gave the superior court, or the judge thereof, power to require security from an executor, has not been brought forward in the code, the court of ordinary alone has not the

jurisdiction to exact bonds of executors for the faithful execution of their trust, and to remove them from office, that is, revoke their letters. Compare *Johns vs. Johns*, 23 *Ga.* 31; *Harrup vs. Winslet*, 37 *Ga.* 655; *Smith vs. Byers*, 41 *Ga.* 447–8; *Dean vs. Cotton Press*, 64 *Ga.* 674; Code, §§2447, 2448, 2511.. There seems much propriety in leaving the power of removal, and of requiring bond, with the court whose officer the executor is. This would not abridge in any way the jurisdiction or efficiency of courts of equity in dealing with assets, for as receivers can be appointed and the assets secured through their agency, these courts need not concern themselves with removing executors or seeing that they give security.

However, the present case requires no decision on these matters. Understanding the order to give bond as a privilege rather than as a command, and the threat to remove the executor and appoint a receiver as contemplating future action, we leave these topics to be dealt with hereafter if the threat should be executed. We feel quite sure it never will be executed, as to removing the executor from office, until after verdict, for if equity can remove at all, it is not to be done by a mere interlocutory order, but by final decree only.

Judgment affirmed.