Knorr, administrator, *et al. vs.* Raymond *et al.*

[Jackson, C. J., being disqualified, Judge Clarke, of the Pataula circuit, was designated to preside in his stead.]

1. Where one who made a deed to land continued to manage and control the property, creating tenancy and collecting rents, it was admissible to show that he stated that he was collecting for his vendee, that the property belonged to the latter, and referred persons to him for the purpose of effecting leases. Such statements tended to show that the acts so done were, in effect, those of the vendee.

(a.) If the person making such statements never had legal title himself, but was a continuing trustee for children, his admissions, while actually engaged in handling the subject-matter of the trust, in such acts as collecting the rents, would be good against the *cestuis que trust.* They were part of the *res gestæ.*

2. The weight of the evidence is that the possession of the tenant on the land was the possession of the vendee thereof, and so far as the verdict found this fact, it was not contrary to law or the evidence.

3. If, at the time a conveyance was made, there was a tenant on the land, placed there by the grantor, if that tenant continued to reside on the land, treating and dealing with the grantor, but the latter was acting for his grantee, then the tenant became the tenant of the grantee, and his possession was that of the grantee.

4. By such possession under written evidence of title for seven years, the title of the grantee, though defective originally, would become perfect by prescription.

5. If the grantee, through such a tenant, was in possession of only a part of the tract, the law would construe the possession to extend to the entire tract covered by the deed.

6. If the grantee had such adverse possession of the land for seven years, upon dispossession he would be entitled to recover it; and there was no error in so charging, unless the presiding judge erred in assuming that the defendants were in a position to be affected by the statutory bar.

7. The abstract principles laid down in the 11th, 12th, 13th, 14th, 15th and 21st grounds of the motion for new trial were the familiar rules of law as to what constitutes possession, its continuousness, its adverseness, and what is color of title; and those charges were correct, unless it was error to assume that, in this case, the only question of fact was whether the plaintiff had had the seven years' possession.

8. Time runs against the equitable estate of minors, if the legal estate resides in one competent to assert their rights.

9. Children provided for in a marriage settlement, where there are not words to indicate affirmatively a different import, are presumed to be the children of the marriage which gives occasion to the settlement. In the present case, there are no contrary words, or, if any, so weak as to be easily overcome; and the children intended to take in remainder were such as might be the offspring of that marriage. Children who might be the offspring of a second marriage of the wife, after the death of her then husband, were not contemplated.

(*a.*) Upon the expiration of such marriage settlement by the death of the husband without children having been born to them, the entire beneficial interest would have reverted to his estate, were it not for the peculiarities of this agreement. Under it, when the marriage settlement became *functus officio,* the legal title in fee simple and the entire equitable interest reverted to the wife, and, upon her re-marriage prior to 1866, the marital rights of her husband attached.

10. The admission of illegal evidence, in support of what is conclusively proved by evidence which the objecting party has already introduced, is no ground for a new trial.

(*a.*) Where the wife and her second husband filed a bill to compel the transfer of stock which had been purchased with funds falling under the marriage settlement, and which had been sold by them, and the trustee under the settlement was a party, he represented the children, who claim under him, and the record construing the settlement was admissible in evidence to bind them.

(*b.*) After the re-marriage of the wife, a conveyance by her second husband, whose marital rights had attached, carried the title; and a charge to that effect was not error.

11. In the case of *Wetter, trustee, vs. Walker,* 62 *Ga.*, 142, it was held that under the second item of the will of Margaret Telfair, the present defendants became entitled to the entire beneficial remainder after their mother's death.

(*a.*) The statute of uses (27 Henry VIII, ch. 10) is in force in Georgia, but this is true only in a qualified sense.

(*b.*) Executed and executory trusts at common law and under the Code defined and discussed.

(*c.*) To ascertain the meaning of contracts, wills, etc., they should be construed or interpreted by the law in force at the time of their making; but whether or not a trust is executed and the legal title passes to the beneficiary does not depend upon the law of force when the trust was created, but depends upon the law of force at the time when the trust is claimed to be terminated.

(*d.*) When the minor beneficiary of such a trust becomes of age, the legal title vests in him.

(*e.*) The legal title to trust property for the benefit of minors being in a trustee for them, time would run against the *cestuis que trust* during possession adverse to him.

12. Where one, who held the title to realty as trustee for certain minors, made a deed thereto as an individual, this did not estop him as trustee from bringing suit against the purchaser, and prescription was not thereby prevented from running in favor of the purchaser, if in possession.

13. Where one, holding land as a trustee, made a deed thereto individually, in which the land was described as "formerly owned by Barak and William Gibbons," and, on the same day, made, with the grantee in the deed, a written agreement in which the premises were described as "now owned by me, and formerly belonging to the family of my deceased wife," and where the grants, deed and wills, by which the title is traced through the Gibbonses and through the family of the grantor's wife, were on record at the time the deed was made by him, this did not amount to actual notice of the trust to the purchaser. A charge that constructive notice would prevent the purchaser from getting title by his deed, but would not defeat prescription, and that notice to affect that result must be such actual notice as to make it a moral fraud in the purchaser to buy and set up title, contained no error as against the defendants.

(*a.*) If there were any evidence of actual notice, a charge that there was none would have been error; but where there is no such evidence, such a charge will not require a new trial.

(*b.*) The court below was authorized to make the assumption that the only question of fact in the case was, whether plaintiffs had had seven years' continuous, adverse possession before they were ousted. The charge on this point was right; the verdict follows it, and was sustained by the evidence.

February 7, 1885.

## Evidence. Principal and Agent. Possession. *Res*

*Gestœ.* Prescription. Infancy. Minors. Husband and Wife. Words and Phrases. Estates. Reversions New Trial. Judgments. Trustees. Title. Contracts. Estoppel. Deeds. Notice. Before Judge ADAMS. Chatham Superior Court. June Term, 1884.

Reported in the decision.

R. R. RICHARDS; W. M. HEYWARD; T. M. NORWOOD; JOSEPH A. CRONK; LESTER AND RAVENEL, for plaintiffs in error.

GEO. A. MERCER, for defendants.

CLARKE, Judge.

On May 10th, 1880, ejectment was begun in Chatham superior court, by the defendants in error, upon the following undisputed facts:

On October 1st, 1869, Augustus P. Wetter, for a valuable consideration, conveyed the premises, in fee simple, as his own property, to Dr. Erastus E. Marcy, who, on December 24th thereafter, made a deed of gift thereof to his daughter, Mrs. Emma Raymond. Wetter's claim of title was based on the 2d item of the will of Margaret Telfair, his wife's grandmother. But the construction thereof, which made him the beneficiary legatee, was overruled by this court in the case of *Wetter, trustee, vs. Walker*, 62 *Ga.*, 142. By that now undisputed interpretation, it is conceded that said Wetter had no title, in his own right, when he sold to Marcy, but that the defendants were entitled in remainder, the life tenant being dead.

Neither said Marcy nor Mrs. Raymond ever had possession in *propria persona*. But prior to said October 1st, to-wit, in January or February, 1869, Wetter had put into possession, as his tenant, one Jim Hamilton, who, at that date, was so holding, and continued to hold till the beginning of this suit. During the whole period from

October 1st, 1869, till his death, pending this suit, said Wetter resided on the western half of the Sharon plantation, the land deeded by him to Marcy being known as the eastern half of the same plantation. In September, 1876, one Frank Sawyer, by virtue of a written contract of lease with one Weed, as agent for Marcy, went into possession of a portion of said eastern part. On February 21st, 1879, R. E. Lester, as attorney at law for the children of said Wetter, demanded of said Sawyer the portion held by him; and shortly afterwards, said Wetter actually ousted Sawyer on a claim that the land belonged to his children, for whom he was trustee. About the same time, said Wetter, upon the same claim of right, put one Tom Campbell into possession of the whole of the disputed premises, subordinating Jim Hamilton to him. Thus, as conceded, whatever possession, or claim of being in possession, Marcy or Mrs. Raymond had, was terminated about February 21, 1879. Said Wetter held till his death for his children.

The suit, on the demises of Marcy and Mrs. Raymond, was brought against said Wetter. He dying *pendente lite*, his administrator, Louis Knorr, was substituted as a party. Edward Telfair Wetter and Alberta T. Gould, the two surviving of the said children, were also made defendants on their own motion, and, in like manner, said Knorr, as administrator of Conrad and of Meta Wetter, the deceased of said children. So the cause proceeded to trial, and to a verdict in favor of the plaintiffs, followed by a motion for a new trial by the defendants on forty-one grounds, upon the overruling of which error is here assigned

1. The plaintiffs below relied mainly on prescriptive title by possession under color of Wetter's said deed. Having never been in possession in their own persons, they claimed said Hamilton as their tenant. To establish this claim, they offered, and the court admitted, the following testimony of said Hamilton, to wit: " The rent " (paid by me) " was reduced to three dollars per month about 1876. Captain Wetter " (*i. e.*, Augustus P.) " then told

v 73-49

me that he had nothing to do with the rent, as he had sold the land to Dr. Marcy, and was collecting the rent for him, and that I must see Mr. Weed. . . . I failed to pay my rent in 1875. Wetter told me in 1875 he would have to put me off if I did not pay him the rent, which he said belonged to Marcy. In 1873, for the first time, Wetter told me the place was Marcy's. In 1877, he told me to see Weed. Captain Wetter collected rent from me from the time I first paid rent . . . till his death. I never paid rent to anybody but him."

Frank Sawyer was also allowed to testify for plaintiffs, on this point, as follows, to-wit: "In 1876, I went to Captain Wetter to lease a tract" (of the disputed premises). "He told me Dr. Marcy owned the part I wanted, and that I must go to Mr. Weed, who was Dr. Marcy's agent."

These sayings of Captain Wetter, as to Marcy's rights and his representing them, the defendants moved to exclude, or at least to have confined, in effect, to such personal interests as Captain Wetter might appear to have in the lands, and denied effect as to the rights of any other defendant. The refusal of this motion is assumed as ground for a new trial.

These statements of Captain Wetter are manifestly competent against himself as admissions. In this application of them, they go to show that, although he was managing and controlling the place, creating tenancy and collecting rents, he was doing all this for Marcy; and that his acts of ownership and the possession thereby witnessed were Marcy's. But, say the plaintiffs in error, such sayings are not good to establish the same fact as against the children. They argue that Captain Wetter either was their continuing trustee, during the period covered by the statements, or, by reason of the trust having been executed, he had ceased to represent their title at all. If the former, they claim that the statements were not made in the line of his duty as such trustee—were not such admissions as

that agency authorized him to make. If the latter, they say, he not representing their rights, his sayings are those of a third party.

We reply: If he was a continuing trustee, holding the legal title for them, his admissions, while actually handling the subject-matter of the trust, in such acts as collecting the rents (which as trustee he was authorized to do), would be good against them. Code, §3774. The Code, §2206, says: " The declarations of the agent as to the business transacted by him are not admissible against the principal, unless they were a part of the negotiation and constituting the *res gestæ*, or else the agent be dead." Captain Wetter was dead when the evidence was admitted. But whether he was a continuing trustee, or the trust had terminated, his statements were admissible as parts of the *res gestæ.* " When it is necessary, in the course of a cause, to inquire into the nature of a particular act, or the intention of the person who did the act, proof of what the person said at the time of doing it is admissible evidence, as part of the *res gestæ*, for the purpose of showing its true character." Bouvier's Law Dict., Title *Res Gestæ;* Code, §3773. In this cause, it was needful to inquire how, in what character, in whose right and for whom Captain Wetter was. acting in controlling, leasing and collecting rents. The fact of his exercising such acts of ownership would receive its character, as being the assertion of dominion in his own right, or for some one else, from the intention with which he acted, if such intention was manifest. So his intention was to be " inquired into." His own declarations, while negotiating about the amount of the rent, and about its enforcement, and when called on to lease out a part of it, while he was controlling and directing, are parts of the *res gestæ.* Upon this principle, it is constantly held that the declarations of one in possession are admissible as to the claim under which he holds. So far does this doctrine go, that such statements are not only admissible against the tenant, and when made against his interest, but they

are admissible, even in his own behalf, against all the world, to prove adverse possession.    Code, §3774; 16 *Ga.*, 16; 42 *Id.*, 623; 62 *Id.*, 53.

The 5th, 6th, 7th and 8th grounds of the motion for a new trial are so many modes of objection to this evidence, and are thus adjudicated.

2. These declarations of Captain Wetter, while he was so superintending this land, tend to show that he was Marcy's agent therein, and that his occupation, by his tenant, Hamilton, was the possession of Marcy.   There was no contradictory evidence as to the intention and character of such acts.   On December 23, 1869, E. A. Raymond, in behalf of his wife, wrote to Captain Wetter as follows: "Dr. Marcy has lately presented to my wife a deed to that portion of Sharon plantation recently transferred to him by you.   I shall be much obliged if you will forward to me a map of this portion of the property."   Wetter replies, January 16, 1870: "The plat, or map, will be forwarded to you as soon as the county surveyor furnishes the same. . . . . . About a week ago, I had an offer of $5,000 for my portion of Sharon, but declined the same. If you are desirous of selling your portion, inform me at once of the fact, and I will act for you, and I have no doubt that the same party will purchase it."   This correspondence, without objection by defendants, was introduced by plaintiffs.   It strongly corroborates the conclusion inferred from the testimony of Hamilton and Sawyer. Thus the weight of the evidence is that Hamilton's possession was Marcy's.   So far as the jury found that fact, the verdict was not "contrary to law" or "to evidence."   42 *Ga.*, 626.

3. The court charged the jury: "If, at the time of the conveyance by Wetter, there was a tenant on the land, placed there by Wetter,—if that tenant continued to reside on the land, treating and dealing with Wetter, but Wetter acting for the plaintiff, then this tenant became the tenant of the plaintiff, and his possession was the possession of

the plaintiff." This charge is the 11th ground in the motion for a new trial. That was right. 44 *Ga.*, 76.

4. The 12th ground complains of a charge, that by such possession, under written evidence of title for seven years, plaintiff's title, though defective originally, would become perfect by prescription. The abstract principle of this charge is but a corollary from the preceding.

5. The charge recited in the 13th ground declares the familiar principle that, if the plaintiffs were " in the actual possession of but a part of the tract, the law would construe the possession to extend to the entire tract covered by the deed," and merely applies that rule to a possession by the plaintiff through such a tenant. The application seems obviously right.

6. The 14th ground assigns as error this charge: " If this plaintiff has had this adverse possession of this land under written evidence of title for seven years, she is entitled to a verdict." This instruction is manifestly the law, unless the judge erred in assuming therein that the defendants below were in a position to be affected by the statutory bar. Of that we will treat hereafter.

7. The charge impeached by the 10th ground of the motion also assumes that, in this case, the only question of fact is, whether plaintiffs have had the seven years' possession. That assumption of the court is maintained through the charges recited in the 11th, 12th, 13th, 14th, 15th and 21st grounds. Whether the judge erred in that assumption will be hereafter considered. For the present, we say that the abstract principles stated in those instructions are but the familiar rules of the law as to what constitutes the possession of a party ; what constitues its continuousness and its adverseness. and what constitutes color of title.

8, 9. Thus far, we have been reviewing the skirmish line. Now we reach the substantial part of the fortifications, behind which the defence below was made.

It is established and conceded that even the oldest of

Captain Wetter's children was a minor in 1879, when their father, in their behalf, terminated the possession of the plaintiffs. During their minority it is claimed that the nearly ten years of possession by plaintiffs (if a fact) would not bar them. To this the plaintiffs below replied: Though the children were minors, yet the legal title was, during that time, in Captain Wetter as their trustee. It is conceded as the well settled law that time does run against the equitable estate of minors, if the legal estate resides in one competent to assert their rights. 8 *Ga.*, 6; 51 *Id.*, 139; 55 *Id.*, 25; 61 *Id.*, 54; 65 *Id.*, 571; 66 *Id.*, 324; *Ford et al. vs. Cook et al.*, 73 *Ga.*, 215.

But the defendants deny that their father did, as trustee, hold the legal title. They maintain that the legal title to a large interest in this land (or to the whole) had vested in them prior to October 1st, 1869, the date of their father's sale to Marcy. They claim that such title to a large interest so vested under a marriage settlement between their mother, the late Mrs. A. P. Wetter, and her first husband, Charles Arnold. They maintain that to whatever interest they did not so acquire such title, they did acquire the legal title by virtue of the aforesaid 2d item of the will of Margaret Telfair, their great grandmother. The point of time at which they claim that the legal title to any or all of the property vested in them, is the date of their mother's death in 1866.

We will consider separately these two sources of their claim to such title.

The said marriage settlement is in evidence. It is called an "indenture," being a contract between Charles S. Arnold and his wife, Alberta, and Edward Padelford, as trustee. Its date is June 2, 1848. It recites certain interests which she held in this and other property before the coverture; and the antenuptial intention of the parties that a settlement thereof should be made before the marriage, "in trust for the benefit of the said" wife, "and upon other trusts and for other uses." It proceeds upon consideration

of " the love and affection he bears to his said wife," and of the said antenuptial intention, and in fulfilment of such intent, to provide the settlement so intended. It conveys the premises, in fee simple, to said Padelford upon the trusts following:

"In trust to and for the sole and separate use, benefit and behoof of the said Sarah Alberta, not subject to the debts of her said husband, for and during the term of her natural life; and from and immediately after her death, then in further trust to and for the use, benefit and behoof of the said Charles Arnold, during the term of his natural life, should he survive her; and from and immediately after the death of such survivor, then to such child or children of the said Sarah Alberta, as she may leave living at the time of her death, to them and their heirs forever."

Charles Arnold died first, leaving his widow childless. She married Captain Wetter in April, 1857, and died in 1866, leaving the four children by Wetter above named. Now two conflicting constructions of this settlement are proposed. The plaintiffs below say that the exigency, which brought this settlement into existence was the marriage between Arnold and his wife and the possible consequences thereof; that such settlement contemplated and provided for the incidents of that marriage only; that in so far as it makes provision for Mrs. Arnold's children, it means her children by Arnold The defendants below insist that the children made remaindermen by that settlement are Mrs. Arnold's children by any marriage, who may survive her. Being such themselves, they claim that, by the statute of uses, the trust in Padelford was executed at the death of their mother (Arnold being dead); and that the legal title in remainder then vested in them, as to so much of the property involved in the present suit as she owned at her death. They introduced evidence to define that part.

In our opinion, from the face of this settlement, the law presumes that the possible children of Mrs. Arnold by Charles Arnold were the remaindermen provided for by it; and that when he died, leaving no issue, the settlement

was *functus officio..* Children provided for in a marriage settlement, where there are not words to indicate affirmatively a different import, are presumed to be the children of the marriage which gives occasion to the settlement.

Here are no contrary words, or if any, so weak as to be easily overcome. The words, " such survivor," upon whose death the children are to take, obviously refer to Charles Arnold. What was to occur upon her death had previously been stated. Nothing is said about her surviving him. The contingency of his surviving her is expressly provided for, and immediately after occur the words, " upon the death of such survivor;" *i. e.*, one so surviving as already described, who, by reason of survivorship, took a life estate. Mrs. Arnold's life estate was not the result of survivorship. The children, who could take in remainder from and "immediately after the death of such survivor," who had by survivorship enjoyed a life estate, must have been such as sprang from the marriage under discussion. That this settlement did not contemplate provision for the incidents of other marriages is also at least intimated by the fact that the settlement does not undertake to extend its protection over her separate rights amid the dangers and exposures of future marriages, but stops with securing her life estate against liability " to the debts of her said husband," Charles Arnold.

Upon the expiration of this marriage settlement by the death of Arnold, the entire beneficial interest would have reverted to Charles Arnold's estate, on the ground that he was the original grantor, were it not for the peculiarities of this agreement. By its terms, he recognizes the property as having been absolutely hers before the marriage, and admits and sets up the antenuptial agreement, by which he was to derive, as his interest, the life estate after her death, as the only benefit through his marital union with her. It is evident that if this settlement had been made before the marriage (as the parties intended and, doubtless, agreed that it should be), she would have occu-

pied the position therein of the original grantor, out of whose absolute fee the less estates were to be carved, and unto whom, on the expiration of the particular estates, the reversion would have gone. Equity considers that done which should have been done; and this settlement recites that the said Arnold " desires to carry out said intentions," alleged to have been antenuptial. Under such a state of mutual obligations as admitted in this marriage settlement, and with no plain stipulations to the contrary, we hold that the husband could get no greater rights by implication than he would have gotten had they made the antenuptial settlement which they agreed to make. Therefore we hold that, when the marriage settlement became, as aforesaid, *functus officio*, the legal title in fee simple and the entire equitable interest reverted to Mrs. Arnold. On her intermarriage with Capt. Wetter, in 1857 or 1858, without a property contract, his marital rights attached. At this point we pause in tracing the title downwards, to consider a question of evidence.

10. To May term, 1858, of Chatham superior court, a bill was filed in favor of Capt. Wetter and wife and John C. Frazier *vs.* The Central Railroad and Banking Company of Georgia and Thomas Harden, which latter defendant had, by decree of the court, in 1854, at the instance of said Arnold and wife, been duly and regularly substituted for Padelford, as trustee under said settlement. The bill alleged that said Wetter and wife had sold to said Frazier certain shares in the stock of said corporation, which shares were the proceeds of a part of the property which said Padelford, as trustee, and said Harden, as his successor, had held in trust under the said marriage settlement; that said company refused to allow said shares to be transferred on its books to said Frazier, because it claimed that, by virtue of said settlement, Mrs. Wetter had only a life estate in said property, and the remainder would go to any offspring which she, at her death, might leave. The complainants in said bill set up that, at the death of

said Arnold, in 1856, without issue of his marriage, the property had become his wife's absolute estate, and that, by her second marriage, it had passed to said Wetter. Harden pleaded to the bill, setting up and exhibiting said settlement, alleging his trusteeship; the fact that the shares in question had, during his administration, become a part of the trust estate; and further alleging that, on January 23d, 1858, Mrs. Wetter had given birth to a son, still living, known by the [extraordinary] name of Edward Josiah Thomas Alexander Telfair Peter Carl Augustus Long Wetter, which son, said Harden urged, would, if he alone should survive his mother, be entitled to the whole of said property; or, if there were then other children of her, that they would together be entitled to it as remaindermen under said settlement. Wherefore he plead nonjoinder of this son as a party.

Upon this plea, Judge William B. Fleming rendered a written decision, which was filed February 11, 1859, overruling said plea, and holding that said settlement did not provide for any children of Mrs. Arnold unless they were born unto Charles Arnold; and that, upon his death and failure of such issue, she had become entitled to the reversion in fee.

Upon the answers of said Harden and of the Central Railroad and Banking Company, in which it was further insisted that she was not entitled to the property beyond a life estate, but that, by said settlement, such children as she might leave would be the remaindermen, a verdict was rendered to the same effect, expressly ascertaining the reversion in fee simple to be in Mrs. Wetter, from the death of Arnold. The formal decree followed the verdict, February 24, 1859.

Now, in the trial of the present cause below, and as bearing on the point of the construction of said marriage settlement as to the rights of Mrs. Wetter's children, plaintiffs offered the entire record above described, as evidence of an adjudication thereof against the defendants. Defend-

ants objected that they were not parties to said record, nor bound by it. The court admitted the record. The 9th ground of the motion for new trial rests on the alleged error of this ruling. By the construction which we have already placed on the settlement, that decree was right, and did not injure defendants. If improper evidence, it was but an unnecessary accumulation on a point already conclusively established by the settlement itself, which the defendants had introduced as the basis of their claim. The admission of illegal evidence, in support of what is conclusively proved by evidence which the objecting party has already introduced, is no ground for a new trial. But whatever right or claim of right defendants could have through that settlement was represented by the trustee, who, according to their theory, held the legal title for them In that aspect of the matter, the adjudication seems to bind them. 64 *Ga.*, 675; 68 *Id.*, 402.

This construction of the marriage settlement disposes of the 9th ground of the motion. It also disposes of such complaint as has been made against the charge stated in the 24th ground, because the court, in asserting therein that "the title to the whole property was originally in Mrs. Margaret Telfair," discarded the claim of defendants to have received title to some interest through said settlement.

It being further in undisputed proof (introduced by defendants), that on May 13, 1859, Captain Wetter, clothed as he was with the whole title, as husband of Mrs. Wetter, conveyed the entire property to said Mrs. Telfair, and the defendants now claiming that under her said will they became invested with the title, there could be no error in the charge last referred to, in that it made the assertion aforesaid. Thus the 24th ground is completely adjudicated.

The 40th and 41st grounds are refusals of the court to charge, on the written request of defendants, a construction of said settlement contrary to our foregoing interpretation. Of course we see no error in that.

11. Thus we come to the next great question in this case. The defendants below say that whatever interest they did not get under the settlement [and that we see now is the whole] they were entitled to under the 2d item of said will. Here they enjoy the advantage of a conclusive adjudication of this court, which is in their favor. In the above cited cause of *Wetter, trustee, vs. Walker*, 62 *Ga.*, 142, it is held that, under the "designation" of "next of kin," etc., of Sarah Alberta Wetter, these, her children, became entitled to the entire beneficial remainder after their mother's death This is conceded as their right. But the plaintiffs reply to that good paper title, their prescription under their deed from Captain Wetter. Defendants essay to rebut that by pleading their minority. Plaintiffs surrebut by alleging that, although the defendants, the owners of the equitable interest, were minors, yet that their father, by virtue of the will and the law, continued to hold the legal title in trust for them, and, therefore, that the statute ran in favor of plaintiffs. The defendants maintain that, at the death of their mother, the life tenant, the trust for them became executed by virtue of the statute of uses (27 of Henry VIII., ch. 10), and that the legal title at once vested in them. Thus arises the issue of law. Under that item of that will, did said trust become so executed at the death of Mrs. Wetter as to vest the legal title in her children?

The terms of said item are as follows:

"I devise and bequeath to Augustus P. Wetter, the husband of my granddaughter, Sarah Alberta C. T. Wetter, all of my property, real and personal, . . . . . to hold in trust for the sole and separate use of my said granddaughter, . . . free from the debts, . . . etc., of her present or any future husband, during her natural life. In further trust, to convey the same, during the natural life of the said Sarah, . . . from time to time, to such persons, and in such portions, and on such considerations, as she may in writing request. In further trust, upon her decease, to make such disposition of said property as she may, by any writing of a testamentary character, direct. In further trust, should she die intestate, to hold said property for the benefit of such persons as may, at the time of her

said decease, come under the designation of her next of kin by the statute of distributions at that time in force in the state of Georgia.''

Mrs. Wetter died in 1866, these four children then surviving.

The statute of the 27th Henry VIII, ch., 10 was enacted in hostility to all trust estates. It was prompted by a feeling of discontent at the numerous inconveniences, which often worked injury and injustice, in consequence of the legal title being held by one, while the beneficial interest was in another. Inconveniences to the *cestui que trust*, to the trustee, to creditors, to legal heirs, to purchasers, to the crown in cases of forfeiture—all such were tenderly considered, as is more particularly and learnedly set forth by Lord Bacon in his '' Reading upon the Statute of Uses,'' being '' His Double Reading to the Honorable Society of Gray's Inn, 42 Elizabeth.'' But more especially was this statute designed to defeat the contrivances by which, in defiance of the various statutes of mortmain, there continued to be so much property dedicated to ecclesiastical establishments. The terms of that statute (*i. e.*, as to the body) are as follows :

'' Where any person or persons, stand or be seized, or any time hereafter shall happen to be seized, of and in any honors, castles, manors, lands, tenements, rents, services, reversions, remainders, or other hereditaments, to the use, confidence or trust of any other person or persons, or of any body politic, by reason of any bargain, sale, feoffment, fine, recovery, covenant, contract, agreement, will or otherwise by any manner of means, whatsoever it be, in every such case, all and every such person and persons, and bodies politic, that have or hereafter shall have any such use, confidence, or trust in fee simple, fee-tail, for term of life, or for years, or otherwise, or any use, confidence, or trust in remainder or reverter, shall from henceforth stand and be seized, deemed and adjudged in lawful seizin, estate and possession of and in the same honors, castles, manors, lands, tenements, rents, services, reversions, remainders and hereditaments, with their appurtenances, to all intents, constructions and purposes of law of and in such like estates as they had, or shall have in use, trust or confidence, of or in the same ; and the estate, title, right and possession, that was in such person or persons, as were or hereafter shall be seized of any lands, tenements or hereditaments, to the use,

confidence, or trust of any such person or persons, or of any body politic, shall be from henceforth clearly deemed and adjudged to be in him, or them, that have or hereafter shall have any such use, confidence or trust, after such quality, manner, form and condition, as they had before in or to the use, confidence or trust that was in them."

Now, it has been repeatedly said that this statute of uses is in force in Georgia.   54 *Ga.*, 233; 57 *Id.*, 159.

But that can be true in only a qualified sense.   If that law were in force, in all its terms, there could stand no trust estate for any existing and ascertained beneficiary. The moment any arrangement was made, whereby any ascertained person was to enjoy the benefit, while another was to hold the legal title for him, *eo instanti* the use would be executed, the trustee would lose all title and right in the premises, and the usee (if allowed by law to hold property) would be clothed with the legal title and all its incidents and consequences.   But the court of chancery in England, which was always the nursing mother of trust estates, promptly put upon this statute a construction which deprived it of much of the force and effect which its authors intended.   Among other limitations put on it, it was held to apply to passive trusts only, in which the trustee had nothing to do but to hold the title and let the beneficiary enjoy the use.   But wherever there was something still to be done by the trustee, the statute was held not to apply.   In the former cases, the trusts were denominated, by the courts and lawyers, " executed."   In the latter, they were called " executory."   Such, then, was the force of the terms " executed" and " executory," that the former always implied the legal title to be passed out of the trustee.

The statute of uses, as construed by the English court of chancery, has been held to be in force here   The terms "executed" and " executory " have commonly been used in law parlance as meaning and implying the same as above; *i. e.*, " executed " meant that the trustee had nothing to

do, but all was done which devolved on him for the purposes of the trust; and it implied, as a consequence, that the legal title had passed into the *cestui que use;* while "executory" meant the contrary state of facts, and implied the contrary consequence. We think it will here-after appear that those terms in the Code, while descriptive of the same state of facts as to the duties of the trustee, and therefore meaning the same as formerly, do not imply always the same consequences as to the position of the legal title.

The statute of uses, as above construed, has been repeatedly applied by this court so as to declare trusts executed and the legal title vested in the *cestui que trust.* In a number of these cases, the *cestui que trust* was a minor at the point of time when such execution of the trust was held to have occurred. *Jordan vs. Thornton et al.*, 7 *Ga.*, 517; *Pope & Wife vs. Tucker*, 23 *Ga.*, 484; *Bowman, ex'r and trustee, vs. Long*, 26 *Ga.*, 142; *Walker vs. Watson*, 32 *Ga.*, 264; *Milledge vs. Bryan*, 49 *Ga.*, 397; etc. In *Milledge vs. Bryan*, Mary Milledge made a trust deed, February 16, 1853, to trustees upon divers trusts; "And in case the said party of the first part should die intestate, then to hold the same for Catherine Milledge, wife of John, and for the children of the said John and his said wife, living at the death of said party of the first part." Gazaway L. Milledge, the plaintiff in the case, was a child of that marriage, and was nearly eight years old when Mary Milledge died intestate; *i. e.*, September 28, 1856. He and three other children, younger, then in life, were held to be co-tenants with their said mother in the undivided property; and the legal title to his share (one-fifth) was held to have vested in him at the death of Mary Milledge. In *Askew vs. Patterson et al.*, 53 *Ga.*, 209, by two trust deeds, dated respectively in June and in July, 1854, property was conveyed to a trustee, "in trust to and for the sole and separate use of Mrs. Marion Patterson," for her natural life, and, after her death, in trust for such child

or children as she may then have living. Mrs. Patterson died April, 1865. The plaintiffs were the children of her, surviving her, and minors at her death. The court below expressly applied the ruling in *Milledge vs. Bryan* to the case, and held that the legal title in remainder vested in these minors on the death of their mother. But that judgment was unanimously reversed by this court. The court held, that the legal title did not pass out of the trustee into these minors, but that the trust estate for their benefit survived until their majority, and accordingly sustained the appointment by the chancellor of a successor to the deceased trustee, and the sale of the land through him to strangers. The case was conceded to be (as to this question) like *Milledge vs. Bryan* in all points but one. In both cases, it remained uncertain until the death of the life tenant in trust, who would be the children then living, and so entitled. The remainders, so contingent, could not vest, even as to the use, until her death rendered certain the beneficiaries. But in the first case, the beneficial and legal title were held to vest in infants at the mother's death, and in the latter the legal title was held not to so vest in the same sort of persons. The earlier of these decisions was rendered at the July term, 1873; the later at July term, 1874,—Justices Warner, McCay and Trippe constituting the court, and presiding in each case. The only ground of distinction between the cases which the learned Chief Justice, in the opinion, claims to perceive is, that the life tenant in trust died in Milledge's case before the Code, and in Askew's after it.

Now, in the case at bar, we have the same facts. Mrs. Telfair's will, creating the trust, antedates the Code, and Mrs. Wetter, the life tenant, dies after the Code.

The earliest Code contained the section (which in the latest is §2306) providing: "Trust estates may be created for the benefit of any female or minor, or person *non compos mentis*." The 2313th section (Code of 1882) defines the terms "executed" and "executory" as follows: "In

the former, everything has been done by the trustee required to secure the property, or to render certain the interest of the beneficiaries, and all that remains for him to do is to preserve the property and execute the beneficial purposes    In executory trusts, something remains to be done by the trustee, either to secure the property, to ascertain the objects of the trust, or to distribute according to a specified mode, or some other act, to do which requires him to retain the legal estate." The following section declares that, " In an executed trust for the benefit of a person capable of taking and managing property in his own right, the legal title is merged immediately into the equitable interest, and the perfect title vests in the beneficiary according to the terms and limitations of the trust." Here is a legislative declaration that, even under such circumstances as antecedently would have occasioned a trust to be called executed; *i. e.*, in a case where, according to the terms of the creation of the trust, " everything has been done by the trustee, required to secure the property or to render certain the interest of the beneficiaries, and all that remains for him to do is to preserve the property, and execute the beneficial purposes," still the legal title shall not pass to the beneficiary, unless he be a party capable of both taking and managing property in his own right.   Thus, in Georgia, the statute of uses is again modified.   It is here established that the " all that remains to be done," even in an executed trust, to-wit, " to preserve the property and to execute the beneficial purposes," is in certain cases a sufficient remainder of duties, and consequent rights, in the trustee to prevent the legal title from passing out of him.   That remainder of duties is so sufficient, whenever the beneficiary, by reason of minority, or from being *non compos*, cannot himself so manage his property as is needful to its due preservation and to the " execution" (*i. e.*, fulfilment) of its beneficial purposes. In such cases, since the beneficiary cannot so preserve the property and execute the purposes—cannot legally admin-

ister the estate—somebody must do it for him. That some-body may as well be the original trustee, or a duly ap-pointed successor in the trust, as a fiduciary called by some other name. As a matter of legislative policy, it has been determined that in such a case the title and control of the property shall not, by operation of law, pass out of the trustee into such incapable beneficiary. · This expla-nation seems to reconcile the apparently inconsistent lan-guage of sections 2313 and 2314. The term, " executed trust," in those sections describes the same state of facts, as to the duties of the trustee, which it described before the Code, but it does not necessarily imply the extinction of the trustee's title.

If these principles of the Code are to be applied to the case at bar, then, owing to the minority of the Wetter chil-dren in 1866, when their mother died, the legal title did not pass to them then, but remained in Captain Wetter as their trustee. But it is said that subsequent law ought not to be applied to the determination of questions aris-ing under a will made before its enactment. It would be a sufficient reply to this to say, that in *Askew vs. Patter-son et al.*, upon the question directly made, this court did distinctly and unanimously decide that such a controversy was to be affected by the Code, and did adjudicate it ac-cordingly. That settled the law. We have been asked to review that decision. We did not refuse to hear argument-ative attacks upon it. We are satisfied, however, to fol-low the maxim *stare decisis*.

A brief unfolding of the principles on which that de-cision seems to rest may not be idle. To ascertain the meaning of contracts, wills, etc., they ought to be con-strued or interpreted by the law in force at the time of their making. Otherwise the real intent of the parties, however legal and laudable at first and at the time of the construction, may be defeated. But whether or not a trust should, at a certain time, or upon a certain event, be held, under the statute of uses, to be so executed as to

pass the legal title from the trustee to the *cestui que trust*, was never made to depend on whether or not the parties to the contract, or the grantor, or testator, intended such a result. The execution of the trust was a result which the statute forced on the parties *nolens volens*. When that statute was enacted, it operated *eo instanti* upon trusts already existing, as well as upon future ones. No matter by what words of unmistakable import the creator of the trust, before or after the act, had declared his determination that the trustee should continue to hold the legal title, the statute declared, on grounds of public policy and with the sovereign voice, that he should hold it no longer. As limited in its effect by the court of chancery, all that the statute asked was, is there, in fact, any further need of the trustee to hold the title—has he any active duties to perform in securing the property or ascertaining the persons and rights of the beneficiaries? It was not, strictly speaking, a rule of construction or interpretation. It was a rule of prohibition against a certain state of things, by whomever and however established, and a legislative fixing of the consequences regardless of intention.

This prohibitory effect and this affixing of results was enforced as well in the cases of minors and lunatics as of persons *sui juris* and in possession of all their faculties. Then no trust estate, in such subject-matter as the statute covered, for the use of an ascertained minor, could stand as such. The very act by which they were made transmuted them into something different. The legal title went immediately into the minor, and the trustee was a mere conduit, not even able, as by friction, to detain the gliding title a single moment in its passage His very election rendered him *functum officio*.

Now let us state the case of *Milledge vs. Bryan*. Mary Milledge, in 1853, created a trust estate for the benefit of Gazaway Milledge, if he should be living at his mother's death Till she died, it being unascertained that Gazaway would be the beneficiary, the trustee had something to do

to "ascertain the interest of the beneficiary." For that reason only the law allowed the trustee to keep the title in remainder—tolerated the trust estate ordained by Mary Milledge in trust for all the purposes taken together. But the life tenant died. Gazaway *manifestly appeared the intended beneficiary in remainder.* There remained no duty on the trustee "to ascertain his rights." On that ground alone the law seized the legal title which had thitherto resided in the trustee and passed it with more than electric speed to Gazaway. Thus that legally abhorred condition of things—a trust estate with no active duties for the trustee—was prevented from coming into existence, or expired in its birth. True, Gazaway was then a minor. But trusts for minors were no favored exceptions from the stern prohibition of the statute of uses.

Now what prevented a trust estate for Gazaway Milledge coming into being and surviving the throes of its birth? Was it the work of construction, in ascertaining that Mrs. Mary Milledge so intended? No. She had created the trust and expressed her purpose as to who should get the benefit of it, and when. To ascertain all these matters of intention, her deed was construed with careful regard to the law in force when she made it, and her real intention about these lawful designs was sacredly regarded. But how long that intermediate and provisional and subordinate state of things, which she brought into existence without ordaining its period of duration, should continue, the law of its own supremacy determined for her. What law? The law in force at the time when the thing forbidden by it would have sprung into existence.

State now Askew's case: In 1854, a trust estate was created for one for life, and, at her death, for persons to be ascertained then. The law allowed the trust estate to stand till the life tenant's death, because, among other duties, the trustee had to ascertain the beneficiaries in remainder, which could not be done while she lived. She died in 1865, and the beneficiaries stood ascertained. All

the work of construction was done by the law in force when the deed was made, to find out its beneficial purposes. Why was the trust estate here not instantly terminated and the legal title passed to the beneficiaries? The beneficiaries were minors. There was then no law existing in Georgia forbidding a trust estate for a minor to come into existence. By express provision of the Code, such trust estates might be "created." What does that mean? Merely that by the form of granting to a trustee for a minor, the minor can take the benefit? Clearly not. That could always be. The statute of uses did not hinder that. But the meaning of the Code is, that that state of things, in which one holds the legal title to secured property for the use and benefit of an ascertained minor, is no longer contrary to the policy of the state of Georgia ; no longer forbidden to be created or to stay in existence, but is expressly favored, on the reasonable ground that such beneficiaries are not " capable of managing property in their own right," and therefore need the protection which such an arrangement may afford. Code, §§2306 and 2314. So, whether the trust were declared to be, by operation of law, terminated or not, in each case, the result is due to the law of force at the time when it is claimed to be terminated. Of course, this is on the supposition that the grant of the legal estate to the trustee does not, by its terms, fix an earlier limit to his title. Certainly he can never take more than is granted to him. The will of Mrs. Telfair expressly authorizes and charges Captain Wetter, as trustee, " to hold for the benefit " of the next of kin. She does not direct when he shall cease to hold. He holds till some law of force comes in and puts an end to his holding. Upon majority of a beneficiary, the statute of uses, having kept quiet pending the minority made exceptional by the Code, comes to the front, and sternly transmutes the trust estate, as to such beneficiary, into a legal remainder.

Certainly the legislature, so long as not violating vested

rights, can provide, from time to time, how the property interests of minors are to be protected and preserved for them. Of this nature, we esteem these provisions of the Code to be, so far as they bear on the question of the time when the legal title sheltered in a trustee shall be, by law, wrested from him and delivered to the minor beneficiary.

We conclude, therefore, that the legal title to the premises in dispute, at and after the death of Mrs. Wetter, remained in Capt. Wetter. Consequently, time would run against his *cestuis que trust* during possession adverse to him.

This point determined disposes of the 18th, 23d and 25th grounds for new trial, in which error is alleged against instructions by the court in accord with our foregoing views. It also disposes of the 28th, 29th and 30th grounds, which complain of the refusal to charge contrary propositions.

12. The court instructed the jury that Capt. Wetter was not estopped by the deed, which, as an individual, he made to Marcy, from bringing suit against him as trustee ; and that prescription was not prevented by any such estoppel from running in favor of Marcy, if in possession. Complaint is made in the 16th and 27th grounds of this charge and of the refusal to charge to the contrary. We see no error here. 3 *Kelly*, 256, 262, 264; 10 *Ga.*, 361; 55 *Id.*, 27; 57 *Id.*, 425.

13. Finally, defendants insisted that the evidence established that Marcy bought with such notice of the trust, that he could get no good title by his deed or by prescription under it. The evidence of notice they find, first, in the fact that in a certain written agreement between Marcy and Capt. Wetter, executed on the same day with said deed, the premises in dispute are described as follows: "One undivided half of a tract of land, four miles from Savannah, of four hundred and seventy acres, now owned by me, and formerly belonging to the family of my deceased wife, said land to be in fee simple and free from all incumbrances." Next, in the deed from Wetter to Marcy, the premises are said to be a part of a plantation

known as the Sharon place, "formerly owned by Barak and William Gibbons." It further appears that the grants, deeds and wills, by which the title is traced through said Gibbonses and through "the family of Mrs. Wetter," down to defendants, were at October 1, 1869, all duly recorded in the proper offices in Chatham county.  Defendants urge that the aforecited recitals amounted to actual notice. They further urge that such records worked constructive notice.  They insist that either of these classes of notice would defeat Marcy's claim of equity as a purchaser without notice, and also prevent his acquiring prescriptive title. We see in all this no evidence of actual notice.  The charge fastened on Marcy constructive notice predicated on the records.  It instructed the jury that constructive notice would prevent Marcy from getting title by his deed, but would not defeat prescription, and that the notice to effect that must be such actual notice as made it a moral fraud in Marcy to buy and set up title.  The defendants complain at the charges and refusals to charge on the question of notice.  We see no fault in them as against defendants. 44 *Ga.*, 274, 276.  True, the judge told the jury that there was no evidence of such actual notice as implied fraud. If we saw any such evidence in the record, we would hold that he erred in not submitting that as a question for the jury.  But we see none.  44 *Ga.*, 645; 50 *Id.*, 631; 58 *Id.*, 427.

After carefully considering all the evidence and all the points presented in this case, we conclude that the court below was authorized to make the assumption, which it did make, and which is in several grounds complained of, that the only question of fact in the case was, whether plaintiffs had had seven years' continuous, adverse possession before they were ousted.  On that question the instructions were right, and involved only the plainest principles.  The verdict followed the charge, and is sustained by the evidence.  Let the judgment of the court below be affirmed.

Judgment affirmed.