chancellor and in compliance therewith, as a condition of his release; but be that as it may, the plaintiff certainly had the right to have the question submitted to the jury. The bond having been given, it was incumbent on the defendant, if he desired to avail himself of that defence, to show that the principal obligor was under duress when he signed it.

The question as to whether or not the surety could avail himself of the defence of duress upon the principal obligor at the time of the execution of the bond, where the duress was known to the surety at the time, is left undetermined by this court. See Code, section 2149; Brandt on Suretyship, 121; Baldwin *vs.* Gordon, 12 Morton, La. An., O. S., 378; State *vs.* Burgy, 6 Robinson, La. An., 63; Jarrett *vs.* Martin, 70 N. C., 459; 6 Robinson, La., 60; Strong *vs.* Grannis, 26 Barb., 122; Blackburn *vs.* Wall, 21 Md., 208; Herrington *vs.* Davis, 13 Miss., 94; Sanders *vs.* Bobo, 2 Baily (S. C.), 492; Caine's Rep., N. Y., p. 9, note a; Robinson *vs.* Schuler, 4 Hunter (N. Y.), 166; Thompson *vs.* Lockwood, 15 Johns, 256; *Brown vs. Ayer & Bates*, 24 *Ga.*, 296; *Governor vs. Williams, Dudley's Rep.*, 245; U. S. *vs.* Tingy, 5 Peters, 129; Burchert *vs.* Brown, 72 Penn. St., 375; Champion *vs.* Noyer, 2 Mass., 487.

Judgment reversed.

---

## FIELDS *et al.* *vs.* CARLTON *et al.*

1. A testator by will left his property to his wife for life, with remainder to two of his children. Before his death, he sold two lots, gave a bond for title, and took notes for the purchase money. The wife qualified as executrix. In 1868, she re-married, and in 1873, her second husband took out letters of administration generally, and not *cum testamento annexo*. Afterwards he bargained with a lawyer to reduce to possession all the lands which the testator claimed, scattered over different portions of the state, and agreed that the lawyer should have one-half of those so recovered. This attorney sent the notes for collection to others in the place where the land lay. By agreement, the lands in dispute were surren-

dered, and the bond for title and notes cancelled. The purchaser testified that this was an absolute cancellation; the attorneys testi·fied that it was on condition that the land was to be sold by the administrator, the notes were to be paid, and if anything remained it was to be returned to him, and if the proceeds were not sufficient to pay the notes, credit was to be given thereon. The land was sold, and the attorney purchased it. He conveyed one-half to the person acting as administrator, and ascertaining that the marriage took place after 1836, caused him to make a deed to his wife. This occurred in 1873 and 1874; and in 1877, the attorney, the person acting as administrator and his wife conveyed to a purchaser, who went into possession and erected valuable improvements. The remaindermen brought ejectment against him:

*Held,* that at the time of his death, the testator had the right to force the collection of the notes of the purchaser from him by suing, filing a deed and levying, or to bring ejectment against him, and the right to enforce payment from the land passed to the legatees under his will. The purchaser could file an equitable plea and cause a sale, or pay the debt and retain the land.

(*a.*) There was privity between the attorney and the purchaser from the testator.

(*b.*) The letters of administration granted to the acting administrator were void; but upon the marriage of the executrix, her letters abated, and her husband had power by statute to proceed with the administration under the will until an administrator, with the will annexed, was regularly appointed, and to act as executor. Therefore the attorney acquired for the estate the right to sell the land and divide the proceeds as agreed on.

(*c.*) The purchaser from the testator could have himself sold the land to the lawyer, and the fact that the sale was made by the acting administrator at public sale was, in effect, the same, though the sale was void as an administrator's sale; and while the attorney and the purchaser under him obtained no legal title, they did acquire what amounts to a perfect equity to one-half of the land, as against the remaindermen.

(*d.*) As to the other half, the attorney acquired no title, legal or equitable; and having paid nothing for it, and conveyed it, through the acting administrator, to his wife, the life tenant, a deed from her and her husband to a purchaser only conveyed her life estate, and was not good as to the fee.

(*e.*) A recovery by the remaindermen of all the land was wrong; and it was error to exclude from the consideration of the jury the evidence of the attorneys as to the settlement.

(*f.*) A new trial should also have been granted on account of the dis·covery of a memorandum in writing of the settlement made as to the land.

(*g.*) The purchaser has no equitable right to set-off the improvements made by him on the half of the estate which was not his in equity, beyond the setting off of their value against *mesne* profits.

(*h.*) The cases of *McPhee vs. Guthrie & Co.*, 51 *Ga.*, 83, and *Dean, ex'r, vs. Feely et al.*, 69 *Ga.*, 804, considered and distinguished from this.

2. When the court was requested to put his charge in writing, he should have put all of it in writing, and not have stated the issues orally to the jury. Nor was this cured by cautioning the jury not to regard what the judge said orally, if it conflicted with what he read to them.

December 1, 1885.

Estates. Ejectment. Remainders. Privity. Administrators and Executors. Husband and Wife. Sales. Attorney and Client. Evidence. Betterments. Equity. Charge of Court. Before D. A. VASON, Esq., Judge *pro hac vice*. Dougherty Superior Court. April Term, 1885.

Reported in the decision

D. H. POPE; R. F. LYON, for plaintiffs in error.

SMITH & JONES; C. B. WOOTEN, for defendants.

JACKSON, Chief Justice.

An action of ejectment was brought by Ida R. Carlton and Lillian Janes against Taylor Fields for the recovery of two city lots on Flint street, in Albany, with the improvements thereon, their title resting on the will of their father, which gave them a remainder estate in all the property he left, after paying his debts. To this suit, Fields filed two pleas, one the general plea of not guilty, and the other an equitable plea, setting up that he is an innocent purchaser for value without notice, and, if not protected by that fact in his title, that he was, at all events, entitled to be protected to the extent of the valuable improvements he had put on the lots since his purchase and possession thereof, under all the facts of the case. On the charge of

the court, the jury found for plaintiffs the premises in dispute, and thereupon Fields made a motion for a new trial, on many grounds therein stated, which was denied on each and all of them, and on this judgment of the court, error is assigned here.

The facts disclosed by the record are, that the bequest gave all the estate to their mother for life, with remainder to these plaintiffs; that the two lots in Albany sued for in this action had been sold by the testator in his life-time to one D. S. Meeds, to whom he gave a bond for titles; that the purchaser, Meeds, went into possession, and put on the lots some buildings of small value; that Mrs. Janes, the mother of plaintiffs and life tenant of all the estate left by her husband, qualified as executrix; that she married one King in 1868, the year after testator's death; that in 1873, King administered, or took out letters of administration on the estate—not letters *cum testamento annexo*, but general letters; that he, after he was clothed with these letters, bargained with Judge Bower, attorney at law, to reduce to possession all the lands testator claimed, widely scattered over the state, and agreed to give him one-half of those so recovered; that these lands in dispute in this litigation alone were recovered by them; that the notes which Meeds gave for the land were sent to Hines & Hobbs by Bower for collection, and that the result was, by contract and settlement, made by Hines & Hobbs with Meeds, a delivery of the land to the administrator, and of the notes, none of which had been paid, to the purchaser, Meeds; or, as Meeds says, to a cancellation of the trade; or, as Bower and Hobbs testify, to its cancellation, on condition that the two lots, with the shops put on them by Meeds, be sold by the administrator, the notes be paid, and if anything remained over of the proceeds of sale, it be paid to Meeds; that the two lots were put up for sale by the administrator, and Bower bought them; that he made a deed to one-half first to King, and then had King to convey to his wife, or relinquish title to her, on his ascertaining that

King individually had no interest, the marriage being after 1866, the date of the woman's act; that these deeds were made, the two first in 1873, and the other in 1874, and that these three persons—King, Mrs. King and Bower—in 1877, conveyed the lots to Fields; that Fields went into possession, and made valuable improvements amounting to several thousand dollars.

So that the exact legal and equitable rights of the parties are not easily ascertained.

1. It seems, however, clear that the remaindermen took, under the will of their father, only the interest of that father in remainder in the property which he left; the bequest is (after ordering debts paid):

"I will that the remainder of my estate, both real and personal, of any description, go to and belong to my much-beloved wife, Elizabeth C. Janes, during her natural life, and after her death, to descend to my two youngest children, Ida R. Janes and Sarah Lillian Janes, to them and their heirs forever, my other heirs, viz., the heirs of Martha A. Hilsman, Leonidas G. Janes, Selah Bond, Mary J. Gibson, Louisa C. Glass and Sulelisia E. Janes, I have already and heretofore gave [given] each of them more than I am able to give to the youngest ones named, the close of the civil war, and circumstances attending the same, having greatly reduced my worldly affairs."

His interest in these two lots at the time of his death was the right to make the purchase money out of them by getting judgment on the notes Meeds gave him, filing a deed to the land and selling the same under execution on the judgment, together with the improvements thereon, and thus, with the proceeds of sale, pay himself the purchase money, or to sue in ejectment for the land, when Meeds could have filed an equitable plea and brought about the same equitable result. This interest in these lots, therefore, in the end of any litigation to enforce it, is the right to recover the notes for the land out of its sale, with the improvements put on them by Meeds; and Meeds's right was to pay the notes and retain the land, or to sell the land to whomsoever he pleased, and pay what he owed the testator therefor, and retain the balance the land sold for, if it brought him more than what he owed for it.

These plaintiffs took, under their father s will, in remainder, whatever interest in these lots their father had when he died,—whatever that interest was. Their father gave them a remainder in all his property. His property, in respect to this transaction with Meeds, was these notes, with his right to recover them out of this land; and their estate in remainder is the same, to-wit, the purchase money, or the notes, for this land, with the right to make that purchase money out of the land.

So that, if Meeds were still in possession of the lots, and they sued him on their mother's death for them, he could set up his equitable right springing out of his bond for titles, and the improvements he had put on the property he bought from their father; or if Meeds had sold the land to another, who had paid him for it, and his grantee had gone into possession and put up valuable improvements thereon, he, too, could set up successfully the same equitable plea.

Therefore, the question here is, what privity is there between Meeds and Fields, who is in possession, who has made valuable improvements on the lots, and who has here an equitable plea to set them off, or to have the land sold and his equities therein estimated and allowed him. The learned judge *pro hac vice* held that there was none, and upon this view the case was tried and the verdict returned.

It appears to us, after a careful study and close examination of the whole case, that there is privity between Meeds and Bower, one of the grantors of Fields, and therefore that there is such privity between Meeds and Fields as will enable the latter to set up and sustain equitable rights, which have been ignored on the hearing.

Bower contracted with King, acting as administrator of the testator, to recover the possession of lands stretching from Walker to Dougherty counties, King agreeing to pay him for his labor the one-half of those lands so recovered, or the value of that half. Among the cases turned over

to him were these two lots in Albany, and these promissory notes having this lien on these lots, so to speak, were entrusted to Hines & Hobbs, lawyers in Albany, by Bower, not residing there, to be collected. Thereupon, Hobbs saw Meeds and contracted with him, and he and Bower settled the case, to avoid litigation with Meeds, upon the terms that the notes should be surrendered to Meeds, and the lots of land sold, and Meeds should have whatever over the amount of the notes it brought. This is the testimony of Hobbs and Bower, while Meeds testifies that the settlement was a simple cancellation. The discovery of a memorandum of the settlement since the trial, on which one ground of the motion for a new trial is based, puts the version of the settlement given by Hobbs and Bower beyond controversy, all of which was regarded immaterial by the court below; and in one view, it is not very material, because, if the trade was cancelled, the land was recovered by Bower, and the contract he made with King gave him half of it on its recovery. But it seems clear that the settlement was to sell the land at administrator's sale, and if it brought more than purchase money, Meeds was to have the balance, and if less, the notes were to be credited and Meeds was to pay the difference.

But it may be said that Bower's agreement with King did not bind the estate of Janes, because his letters were void. We agree with the presiding judge that they were void; but it does not follow that the contract to recover the land and get half is not good. Upon the marriage of Mrs. Janes to King, her letters testamentary abated, but King *eoinstanti* was clothed with power by statute to go on with the administration under the will until an administrator, with the will annexed, was regularly appointed by the ordinary. Code, §2443. This is its enactment: " Until the appointment of a representative of the estate, the husband may act in right of his wife, and shall be responsible as if he was executor." If his letters, then, were void, no representative had been appointed, and his authority to act as executor remained good by virtue of the statute.

It follows that, by virtue of the settlement made by Hobbs and Bower with Meeds, they acquired for the estate of Janes from Meeds the right to sell the land and divide the proceeds as agreed upon. Meeds could have sold it to Bower himself, paid off the indebtedness for purchase money and pocketed the balance. What practical difference does it make that he authorized him to sell or have the land sold? If he had sold and conveyed himself, Bower would have stood in his shoes with all his rights; if he authorized King to sell, what difference does it make in equity? None that we can see, especially when the apparent, natural equity is that this innocent purchaser for value should not lose all the value of the improvements he put upon the property. It should be borne in mind, too, that though King's letters were void, he was still clothed with power as executor until an administrator was appointed, and liable as such; and while the order to sell as administrator was void, yet he did, as executor, have the right to collect these notes as assets and make settlements thereof; and the settlement he made with Meeds through his counsel seems just and equitable.

By this settlement of the case, which had thus arisen between the acting executor of Janes and Meeds, made to save expenses and costs, it appears, Meeds being unable to pay the purchase money, the land was recovered by the estate of Janes to be sold; it was sold, and Bower bought it, and King, as administrator, made him a title to it. Therefore, by the action and agreement of Meeds, it was sold to Bower by King, as administrator, it is true, but still by virtue of a settlement with Meeds, who was in possession of the land, and who must have been ejected from it by suit, or must have yielded his assent by settlement, before it could have been recovered and sold. Thus, it seems to us that Meeds was a party to this sale. He was interested therein. Had the lots, with his improvements, brought more than the purchase money and interest, the excess of the sum the lots brought was to be paid to

v 75-36

him, and if they did not bring enough to pay the purchase money, he was to supply the deficiency; so that, in selling the land, King was his agent in carrying into effect the arrangement which paid his debt to the estate of Janes, and by which he would have received something additional, if the lots had been sold for more than enough to extinguish his debt. Substantially it is the same as if he had sold it himself, or had got King to sell it privately for him, and pay the estate of Janes his debt to that estate; that he sold it publicly by the settlement and contract of Meeds, surely in equity ought not to affect the equitable rights derived from the sale; that the public sale was made by King, as administrator, and not as representing the executrix named in the will, and whom he had married, and by virtue of that marriage could act as executor till a regular representative was appointed to administer *de bonis non*, with the will annexed, the estate of Janes, should not destroy all the equities of an innocent purchaser who bought for value at the sale.

Whilst, therefore, Bower, who bought at the sale and sold to Fields, the defendant, acquired no strictly legal title at this sale, because it was made irregularly, and Fields acquired none from him, yet Bower did acquire what amounts to a perfect equity to one-half of these lots against these plaintiffs. He paid this estate full value for his half thereof by his labor and management as counsel. He acquired the possession of it for all interested therein in remainder or otherwise; and by contract with King, who, as acting executor under the statute, contracted with him to pay half the lots, if recovered, he became entitled to half this land, and though King conveyed it all to him under an illegal sale made under void letters, and thus conveyed him no strictly legal title, the payment of half the purchase money of the land by his labor and his possession thereunder give him that perfect equity thereto which will defend or recover in ejectment. So that he could defend against these remaindermen his possession

of one-half of the lots, had he retained it; and when he conveyed to Fields, the defendant here, he transmitted to him the equity he himself had; and as Bower held under a sale made by one substantially Meeds's agent, and sold to Fields, Fields is in privity with Meeds; and his equity thus derived from Bower is strengthened by the fact that he innocently bought the entire property, and has put valuable improvements thereon.

The conclusion, it seems to us, must be that the facts make a successful defence for Fields to one-half of this property.

In respect to the other half, it seems to us that Bower has no title, legal or equitable; none legal, because he got none. He paid this estate nothing for it, and has none equitable. He made a deed to Mrs. King virtually, first to King, and by his relinquishment to his wife, to her. But he did not recover this land from Meeds for her except for her life; and this conveyance transmitted nothing to these plaintiffs entitled to the remainder. Therefore, Bower's deed to Fields did not convey this other half, for he turned it all over to Mrs. King; and Mrs. King was only entitled to a life estate, and therefore her conveyance to Fields is only good for her life estate. It did not convey the remainder in fee. Nor does King's conveyance—for all three joined in it—pass any title out of these remaindermen into Fields, for he had none. All that Bower tried to convey to him he had relinquished to his wife, and he had no pretense of a title of any sort to any part of the land.

The conclusion we reach is that, under the facts disclosed by this record, together with the memorandum of the settlement with Meeds, the recovery of all the premises in dispute is wrong; that the exclusion from the jury of the consideration of the evidence of Hobbs and Bower touching the settlement with Meeds is error, as well as the denial of the new trial on account of the discovery of the memorandum in writing of that settlement, and that there should be a new trial on the law and equity of the case.

We cannot see that Fields has any equitable right to set off the improvements he put on the half of the estate not his own in equity, beyond the setting off of their value to extinguish the mesne profits, and this was allowed him by the court below.

We have examined the case of *McPhee vs. Guthrie & Co.*, in 51 *Ga.*, 83, and find that the case there was decided on its own particular facts. The title had not gone into Guthrie & Co., but simply a mortgage deed was made to them, and Chief Justice Warner, in the opinion, lays stress on that fact. They were mortgagees, and had a lien in law and equity only on the land as it stood before sold to McPhee, who put the improvements upon it; and the court held that, in that case, the purchaser could set off improvements in equity, and recover their value, after paying the principal and interest on the mortgage out of the land before improved, directing the sale of the land, and that the mortgage be first paid out of the land, less the improvements, and then the value of the improvements be paid to McPhee, the claimant. But the case at bar is a case of title in these legatees in remainder, after the lots were recovered, and no legal purchase at all by Fields, and no perfect equity to one-half of the land.

So in *Dean, ex'r, vs. Feely et al.*, 69 *Ga.*, 804, it will be seen that the extent to which this court went was to allow the purchaser for value, without notice, to set off improvements against all mesne profits before, as well as after, their erection, and in that case, too, there was no doubt about the *bona fides* of the purchaser. But the ruling on the facts allowed the purchaser only to extinguish mesne profits, but not to trench at all on the *corpus*.

2. We think further, that when the court is requested to put his charge in writing, all should be in writing, and an oral submission of the issues violates the rule. The proper statement of the issues is a very important part of the charge, and should be in writing, as well as the balance of the charge; nor will the caution to the jury not to regard

what the judge said orally, if it conflicted with what he read from the writing, cure the error. It might confuse them greatly, if no other harm was done. We say nothing about equities between King and these remaindermen, and how far they may have been transmitted in equity to the plaintiff in error, so as to be set off in his favor against them out of the proceeds or their half. We mean, their indebtedness to him for support during minority. No facts are here, in regard to it, sufficient to enable us to say aught about it.

Judgment reversed.